**Brenda CAMPBELL, Plaintiff/Appellant,**

v.

**FLORIDA STEEL CORPORATION,
Defendant/Appellee.**

Supreme Court of Tennessee,
at Knoxville.

March 11, 1996.

Jim D. Own, Owen, Edwards & Bryant, and Robert S. Olive, Sandra G. Olive, Olive and Olive, P.C., Knoxville, for Appellant.

Gavin S. Appleby, Erin E. Matthews, Powell, Goldstein, Frazer and Murphy, Atlanta, GA, L. Caesar Stair, III, Bernstein, Stair & McAdams, Knoxville, and Regina Alberini, Jacksonville, FL, for Appellee.

W. Ovid Collins, Jr., Charles Hampton White, and Rebecca Wells–Demaree, Cornelius & Collins, Nashville, for Amicus Curiae, Tennessee Association of Business.

## OPINION

ANDERSON, Chief Justice.

We granted this appeal to determine whether "cold-shoulder treatment" of an employee, which is neither racially nor sexually explicit, may, if based on race or gender, constitute unlawful harassment in violation of the Tennessee Human Rights Act and the Federal Civil Rights Act.

Plaintiff, Brenda Campbell, an African–American female, brought this employee discrimination action under the Tennessee Human Rights Act and Title VII of the Federal Civil Rights Act, alleging sexual and racial harassment against her employer, Florida Steel Corporation, based upon the behavior of three of her co-workers.

After a bench trial, the trial court first found that Campbell had been subjected to racial and sexual harassment, but concluded that Florida Steel had, after receiving notice of its existence, promptly eliminated the harassment. The trial court further found that after the harassment was terminated, Campbell's co-employees subjected her to "cold-shoulder treatment," and that Florida Steel was aware of the treatment but failed to promptly eliminate it. As a result, the trial court concluded Campbell was constructively discharged and entitled to damages.

On appeal, the trial court's damage award was reversed by the Court of Appeals, which concluded that neither the federal nor state act require employers "to ensure a pleasant social environment," and that there was, therefore, no constructive discharge. The Court of Appeals also decided that the appellate standard of review should be *de novo* because the "issue of constructive discharge is, at least partially, a question of law."

We agree with the result reached by the Court of Appeals, but disagree with the rationale. First, we disagree with the Court of Appeals' conclusion that conduct must be explicitly sexual or racial in nature to constitute unlawful harassment. We conclude that any disadvantageous treatment of an employee which would not occur but for the employee's race or gender may, if sufficiently pervasive, constitute unlawful harassment in violation of Title VII and the Tennessee Act.

Second, we disagree that the finding of constructive discharge in this case is subject to *de novo* review. A trial court's conclusions of law are subject to *de novo* review, while a trial court's findings of fact are af-

forded a presumption of correctness. We conclude that the trial court correctly applied the law of constructive discharge, and that its factual finding of constructive discharge is to be reviewed in accordance with Tenn. R.App.P. 13(d) and must be afforded a presumption of correctness.

Because, in this case, the evidence preponderates against the trial court's finding that the employer failed to respond promptly and effectively to the cold-shoulder treatment and also against its finding of constructive discharge, we affirm the Court of Appeals' judgment reversing the trial court on the separate grounds stated.

## BACKGROUND

The plaintiff, Brenda Campbell, was hired by defendant, Florida Steel, on September 19, 1988, as a yard helper. In this entry level position, Campbell did not work in any particular area of the plant, but received daily work assignments from her supervisor, Stephen Nash. Approximately five weeks after being hired, Campbell fell while on the job and broke her arm. As a result of the accident, she was assigned to light duty work in the "mechanic shop." Ernesto Bosch was the temporary supervisor in the mechanic shop, substituting for Nash, at the time Campbell was assigned to that area.

It is undisputed that prior to her assignment to the mechanic's shop, Campbell had not previously been sexually or racially harassed by anyone at Florida Steel. It is also undisputed that she was subjected to both sexual and racial harassment by three co-workers from the time she was temporarily assigned to the mechanic shop on December 15, 1988, until December 31, 1988. At that time, another co-worker informed Bosch that Campbell was upset by sexual and racial comments being directed towards her by other employees in the mechanic shop. Later that day, Bosch questioned Campbell about the situation and, for the first time, was informed about the specific sexual and racial remarks directed toward Campbell by three of her co-workers. That evening, at a New Year's Eve party, Bosch discussed the situation with Bill Kipp, the Employee Relations Manager for Florida Steel.

January 4, 1989, was Campbell's first day back to work after the New Year's Eve holiday, and coincidentally, Nash resumed his supervision of the mechanic shop that same day. Shortly after the workday began, Campbell and Nash were called to meet with Kipp and Kurt Zetzsche, the Knoxville plant manager, regarding the incidents of harassment Campbell had discussed with Bosch on December 31, 1988. During that meeting, at the urging of Nash, Kipp and Zetzsche, Campbell, for the first time, identified the three harassing co-workers.

Immediately following the meeting with Campbell on January 4, 1989, Nash, Kipp, and Zetzsche met individually with each of the three co-workers Campbell had identified. Each man was reprimanded and warned that if the behavior persisted, it would result in further disciplinary action, up to and including termination. Written documentation of the reprimands were placed in the employees' personnel files.

Following the January 4, 1989, meeting, Campbell was purposefully reassigned to other areas of the plant so that she could avoid contact with the harassing co-workers. From that time, Campbell's contact with those three co-workers was minimal, and it is undisputed that no additional racial or sexual comments were directed toward Campbell after the January 4th meeting.

Thereafter, however, Campbell expressed concern to her supervisor that some of her co-workers were giving her the "cold-shoulder treatment." According to Campbell, her fellow employees would ignore her completely, shun her, and prevent her from sitting down in the lunch and break areas, though previously, they had made room for her to join them. At times, her co-workers would leave the room when she entered.

Nash testified that after the January 4th meeting, he spoke to Campbell on a daily basis, and that she discussed with him, in general terms, the cold-shoulder treatment, but she did not identify the specific individuals involved, despite his repeated attempts to elicit names. At trial, Campbell still did not identify specific individuals involved in the cold-shoulder treatment.

In response to her complaints, Nash assured Campbell that the atmosphere would improve with time, and he said that Campbell acknowledged that the cold-shoulder treatment was improving. Nash admitted that he never specifically advised Campbell's co-workers to talk to her, but said that he did try to involve Campbell in conversations with her co-workers at every opportunity.

In addition to the "cold-shoulder treatment," Campbell testified that on more than one occasion after the January 4th meeting, one of the original harassers privately made threatening comments to her, such as, "shh, here comes the snitch," and on one such occasion said, "you know what we do to a snitch," while hitting the palm of his hand with an object. Campbell conceded that she never related any of these comments to Florida Steel management personnel, and the trial court specifically found that Florida Steel had no actual or constructive knowledge of any of these incidents.

On January 14, 1989, two weeks after Florida Steel took corrective action to eliminate the harassment, Campbell resigned. Several Florida Steel representatives, including Nash, tried to convince Campbell to reconsider her decision. Nash offered Campbell a temporary transfer to the warehouse, which she refused. Following her resignation, Campbell filed this employee discrimination action, alleging that she had been subjected to sexual and racial harassment which created a hostile work environment that resulted in her constructive discharge.

The case was tried without a jury in Chancery Court over a period of four days. The Chancellor concluded that Campbell had been subjected to racial and sexual harassment by three of her co-workers, but that Florida Steel had promptly and properly acted to eliminate the harassment after receiving notice of its existence. The Chancellor also determined that Florida Steel had notice of the cold-shoulder treatment, but chose to take a "wait and see" approach, and, as a result, failed to eliminate it. Accordingly, the Chancellor found that Campbell was constructively discharged and awarded $15,416 in back pay, $10,000 for mental distress, $5,898.40 for fringe benefits lost, $25,416 in

attorney's fees, and $2,248 for costs and expenses of litigation.

The Court of Appeals affirmed the trial court's finding that Campbell had been subjected to a hostile work environment, and held that Florida Steel had promptly and properly dealt with the sexual and racial harassment after receiving notice of its existence. The Court of Appeals, however, reversed the trial court's finding of constructive discharge and dismissed the action, concluding that neither the Tennessee Human Rights Act nor the Federal Civil Rights Act require employers "to ensure a pleasant social environment." Since "[t]he cold-shoulder treatment was not itself of a racial or sexual nature," the Court of Appeals explained, Florida Steel had no legal duty to eliminate it and is not subject to liability for its continuation.

We granted Campbell's application for permission to appeal to consider this important question.

### HOSTILE WORK ENVIRONMENT HARASSMENT

The disputed issues in this appeal are whether the Court of Appeals erred in concluding that Florida Steel had no duty, under either Title VII of the Federal Civil Rights Act or the Tennessee Human Rights Act, to eliminate the cold-shoulder treatment which was not racially derogatory or sexually explicit in nature, and whether the Court of Appeals erred in concluding that Campbell was not constructively discharged.

Resolution of these issues requires an examination of the law relating to hostile work environment harassment and constructive discharge. This Court has not addressed the issues raised in this appeal previously, and indeed, Tennessee authority on the subject is sparse.

We begin our analysis with Title VII of the Civil Rights Act of 1964, which makes it unlawful for an employer to "discriminate against any individual with respect to ... compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Likewise, under the Tennessee Human Rights Act, it is unlawful for an employer "to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's race, creed, color, religion, sex, age, or national origin." Tenn.Code Ann. § 4–21–401(a)(1) (1991 Repl.).

■ The stated purpose and intent of the Tennessee Act is to provide for execution within Tennessee of the policies embodied in the federal civil rights laws. Tenn.Code Ann. § 4–21–101(a)(1) (1991 Repl.); *Bennett v. Steiner–Liff Iron & Metal Co.*, 826 S.W.2d 119, 121 (Tenn.1992). Accordingly, our analysis of the issues in this appeal is the same under both the Tennessee Human Rights Act and Title VII of the Federal Civil Rights Act.

It is beyond dispute that both the Federal and State Acts apply to claims of discrimination based on the existence of a hostile work environment. The Fifth Circuit was apparently the first court to interpret Title VII to cover such claims. In *Rogers v. E.E.O.C.*, 454 F.2d 234 (5th Cir.1971), that court recognized that "today employment discrimination is a far more complex and pervasive phenomenon," and held that Title VII "sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination." *Id.* at 238.

The United States Supreme Court first explicitly recognized that hostile environment harassment claims are cognizable under Title VII in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), a sexual harassment case. The Supreme Court approvingly cited *Rogers* for the proposition that "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Id.*, 477 U.S. at 65, 106 S.Ct. at 2405. Observing that courts previously had applied that principle to harassment based on race, religion, and national origin, *id.*, the *Meritor* court concluded that "a hostile environment based on discriminatory *sexual* harassment" should likewise be prohibited under Title VII. *Id.*, 477 U.S. at 66, 106 S.Ct. at 2405 (emphasis in original).

More recently, in *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court explicitly affirmed the proposition that racial harassment in employment is actionable under Title VII. *Id.*, 491 U.S. at 180, 109 S.Ct. at 2374.

■ Hostile work environment harassment occurs "where conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Meritor*, 477 U.S. at 65, 106 S.Ct. at 2404.

■ To prevail on a hostile work environment claim in a sexual harassment case, an employee must assert and prove that (1) the employee is a member of a protected class; (2) the employee was subjected to unwelcomed sexual harassment; (3) the harassment occurred because of the employee's gender; (4) the harassment affected a "term, condition, or privilege" of employment; and (5) the employer knew, or should have known of the harassment and failed to respond with prompt and appropriate corrective action. *Rabidue v. Osceola Ref. Co.*, 805 F.2d 611, 620 (6th Cir.1986);[1] *see also Cortes v. Maxus Exploration Co.*, 977 F.2d 195, 199 (5th Cir.1992); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3rd Cir.1990); *Hirschfeld v. New Mexico Corrections Dept.*, 916 F.2d 572, 575 (10th Cir.1990); *Paroline v. Unisys Corp.*, 879 F.2d 100, 105 (4th Cir. 1989) (revs'd in part on other grounds, 900 F.2d 27 (4th Cir.1990) (en banc)); *Hall v. Gus Constr. Co., Inc.*, 842 F.2d 1010, 1013 (8th Cir.1988); *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 904 (11th Cir. 1988).

■ Similarly, in order to prevail on a hostile work environment racial harassment claim, a plaintiff must prove (1) membership in a protected class; (2) racially motivated conduct that constituted an unreasonably abusive or offensive work-related environment or adversely affected the reasonable employee's ability to do his or her job; and

---

1. To the extent that *Rabidue* required an employee to establish psychological harm, it has been abrogated. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

(3) the employer knew or should have known of the harassment and failed to respond with prompt and appropriate corrective action. *Davis v. Monsanto Chemical Co.,* 858 F.2d 345 (6th Cir.1988); *see also Daniels v. Essex Group, Inc.,* 937 F.2d 1264, 1270 (7th Cir. 1991).

▪ In either context, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment and there is no Title VII violation." *Harris,* 510 U.S. at ——, 114 S.Ct. at 370.

▪ In determining whether an environment is hostile or abusive, a court must consider the totality of the circumstances. *Id.* While no single factor is required or conclusive, considerations relevant to the determination include, but are not limited to, the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance; and the employee's psychological well-being. *Id.*

▪ Moreover, the conduct underlying a hostile environment claim need not be clearly sexual in nature. Before 1985, there were court decisions indicating that the predicate acts underlying a sexual harassment claim had to be clearly sexual in nature. *See e.g. Downes v. F.A.A.,* 775 F.2d 288, 290 (Fed. Cir.1985). However, in *McKinney v. Dole,* 765 F.2d 1129 (D.C.Cir.1985), the District of Columbia Court of Appeals rejected that narrow definition and held "that any harassment or other unequal treatment of an employee or group of employees that would not occur but for the sex of the employee or employees may, if sufficiently patterned or pervasive, comprise an illegal condition of employment under Title VII." *Id.,* 765 F.2d at 1138–39.

Other courts considering the issue since have agreed with the *McKinney* rationale

and have concluded that "intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances." *Hall,* 842 F.2d at 1014; *see also Harris,* 510 U.S. at ——, 114 S.Ct. at 372 (Ginsburg, J., concurring) (The key issue "is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed"); *King v. Hillen,* 21 F.3d 1572, 1583 (Fed.Cir. 1994); *Kopp v. Samaritan Health Sys., Inc.,* 13 F.3d 264, 269 (8th Cir.1993); *Andrews,* 895 F.2d at 1485; *Hicks v. Gates Rubber Co,* 833 F.2d 1406, 1415 (10th Cir.1987).

▪ Moreover, the same reasoning applies to racial harassment hostile environment claims. Racial harassment can exist, though the conduct at issue is not racially derogatory in nature. The key inquiry is whether an employee, or a group of employees, of one race has been subjected to disadvantageous terms or conditions of employment to which members of another race are not exposed. *See e.g. Firefighters Inst. for Racial Equality v. City of St. Louis,* 549 F.2d 506 (8th Cir.1977) (Holding that the city's duty to provide a nondiscriminatory working environment required it to provide by regulation that on-duty firefighters would not be permitted to use city kitchen facilities if the firefighters' supper clubs excluded black firefighters from membership). Indeed, as the *Harris* court recognized, a plaintiff need only prove that "discriminatory" conduct resulted in a hostile work environment. *Harris,* 510 U.S. at ——, 114 S.Ct. at 370.

▪ Finally, Title VII does not impose strict liability for hostile environment claims. Even if an employee establishes the existence of a hostile work environment, the plaintiff will not recover under Title VII unless the proof demonstrates that the employer either knew or should have known of the harassment, *and* failed to take prompt and appropriate remedial action. *Nash v. Electrospace System, Inc.,* 9 F.3d 401, 403 (5th Cir.1993); *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (11th Cir.1989);

*Barrett v. Omaha Nat. Bank,* 726 F.2d 424, 427 (8th Cir.1984).

Title VII does not precisely define "prompt and appropriate remedial action;" however, in general, employers are required to take steps "reasonably calculated" to terminate the harassment. *Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526, 536 (7th Cir. 1993) (citing cases). Of course, what remedial action is reasonable and appropriate will vary depending on the circumstances of each case. *Davis,* 858 F.2d at 349.

Applying the foregoing principles to the facts of this case, it is clear that the trial court and the Court of Appeals correctly concluded that Campbell was subjected to hostile work environment sexual and racial harassment, and that upon receiving notice, Florida Steel promptly and effectively eliminated the harassment that was explicitly sexual and racial in nature. We cannot, however, agree with the Court of Appeals' broad statement that Title VII does not, under any circumstances, require an employer to eliminate conduct which is not racially derogatory or sexually explicit in nature. We conclude that if an employee is subjected to discriminatory conduct on the basis of race or gender, and the discriminatory treatment creates a hostile work environment and the employer has notice, a duty exists on the part of the employer to take prompt and appropriate remedial action, reasonably calculated to terminate the harassment.

Applying that standard to the specific facts in this case, we observe that Nash, Campbell's immediate supervisor, testified that he spoke with Campbell on a daily basis after the January 4th meeting at which action had been taken to eliminate sexual and racial harassment. When she complained of the cold-shoulder treatment, he repeatedly requested that she provide the names of those individuals involved. Campbell never identified any of the individuals involved, even when Nash suggested specific names to her. From her viewpoint, Campbell was no doubt faced with a Hobson's choice—identify the offenders, be labeled a snitch and suffer the consequences, or refuse to identify them, making it impossible for the company to

alleviate the problem, and continue to suffer. The threats from one of the original harassers may have had some influence as well. In any event, she chose to keep silent.

Kipp, Florida Steel's personnel manager, testified that had the plaintiff identified the individuals engaging in the cold-shoulder treatment, company officials would have taken action. In addition, Nash testified that at every opportunity he involved Campbell in conversations with other employees in the plant, and that, at one point, Campbell told him that the situation was improving.

We conclude that the evidence establishes that Florida Steel attempted to address the problem, but was limited by Campbell's reluctance to "snitch" on her fellow employees. Accordingly, even if we assume that Campbell was subjected to the cold-shoulder treatment because of her race or gender, and further assume that such discriminatory conduct resulted in a hostile work environment, we still agree with the Court of Appeals' conclusion that the evidence preponderates against the trial court's finding that Florida Steel failed to take prompt and appropriate remedial action to eliminate the cold-shoulder treatment. Instead, we conclude that Florida Steel responded appropriately based on the available information, and is not liable under either Title VII or the Tennessee Human Rights Act for hostile work environment harassment.

We next consider the Court of Appeals conclusion that Campbell failed to establish that she was constructively discharged.

## CONSTRUCTIVE DISCHARGE

The doctrine of constructive discharge first developed under the National Labor Relations Act and is, in that branch of law, well-established. *See Goss v. Exxon Office Sys., Co.,* 747 F.2d 885, 887 (3rd Cir.1984) (citing cases).

In *Young v. Southwestern Sav. & Loan Ass'n,* 509 F.2d 140, 144 (5th Cir.1975), the former Fifth Circuit determined that when "an employee involuntarily resigns in order to escape intolerable and illegal employment requirements" to which the employee is subjected because of race, color, religion, sex, or

national origin, the employer has committed a constructive discharge in violation of Title VII of the Federal Civil Rights Act.

While application of the constructive discharge doctrine now has received apparently universal recognition among the federal circuit courts of appeal, *Goss,* 747 F.2d at 887, there is a divergence of opinion among the federal circuits as to the factors necessary to support a finding of constructive discharge, and as to the standard of appellate review applicable to a finding of constructive discharge.

Most courts begin with the proposition that a constructive discharge exists "if working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Bruhwiler v. University of Tennessee,* 859 F.2d 419, 421 (6th Cir.1988); *see also Saxton,* 10 F.3d at 537; *Cortes,* 977 F.2d at 200; *Hirschfeld,* 916 F.2d at 580; *Paroline,* 879 F.2d at 109; *Maney v. Brinkley Mun. Waterworks and Sewer Dept.,* 802 F.2d 1073, 1075 (8th Cir.1986); *Wardwell v. School Board of Palm Beach County, Fla.,* 786 F.2d 1554, 1557 (11th Cir.1986).

However, courts disagree as to whether a plaintiff must show that the discrimination complained of amounted to an intentional course of conduct on the part of the employer calculated to force the employee's resignation. The minority view is that an employee must prove that the actions complained of were intended by the employer as an effort to force the employee to quit. *Martin v. Cavalier Hotel Corp.,* 48 F.3d 1343, 1354 (4th Cir.1995); *Maney,* 802 F.2d at 1075. However, a majority of courts considering the issue require only a showing that the employer knowingly[2] permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign. In other words, a showing that a reasonable employer would have foreseen the employee's resignation, given the intolerable conditions of employment. *Wheeler v. Southland Corp.,* 875 F.2d 1246, 1249 (6th Cir.1989); *see also Stetson v. NYNEX Service Co.,* 995 F.2d 355, 360–61 (2d Cir.1993) (ADEA claim); *Jurgens v. E.E.O.C.,* 903

F.2d 386, 390 (5th Cir.1990); *Watson v. Nationwide Ins. Co.,* 823 F.2d 360, 361 (9th Cir.1987) (Title VII racial discrimination claim); *Garner v. Wal–Mart Stores, Inc.,* 807 F.2d 1536, 1539 (11th Cir.1987); *Calhoun v. Acme Cleveland Corp.,* 798 F.2d 559, 561 (1st Cir.1986) (ADEA claim); *Derr v. Gulf Oil Corp.,* 796 F.2d 340, 344 (10th Cir.1986); *Goss,* 747 F.2d at 888.

■ We agree with the majority rule that requires only a showing that a reasonable employer would have foreseen the employee's resignation, given the intolerable conditions of employment, and hold that to establish a constructive discharge, an employee need only show that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign. This standard is particularly appropriate in the context of hostile work environment harassment, where it would be very difficult, if not impossible, for a plaintiff to prove that an employer imposed the intolerable working conditions with the specific intent to force the employee to resign.

■ We emphasize, however, that in the context of a hostile work environment claim, that standard requires a plaintiff claiming constructive discharge to demonstrate that the harassment is so severe or pervasive that work conditions were intolerable, a showing greater than the minimum required to prove a hostile work environment. *Landgraf v. USI Film Products,* 968 F.2d 427, 430 (5th Cir.1992); *Henry v. Lennox Indus., Inc.,* 768 F.2d 746, 752 (6th Cir.1985). The policy and purpose of Title VII of the Federal Civil Rights Act and the Tennessee Human Rights Act is to end discrimination in employment. In our view, that policy will be best served if, "wherever possible, unlawful discrimination is attacked within the context of existing employment relationships." *Jurgens,* 903 F.2d at 390. That policy is furthered by requiring plaintiffs who claim constructive discharge to demonstrate that the work environment is not only hostile and abusive, under the Title VII standards discussed above,

---

**2.** Either actual or constructive knowledge will suffice.

but is so intolerable that a reasonable person subjected to it would resign.

Finally, we address the appropriate standard of appellate review applicable to a finding of constructive discharge. The overwhelming majority of other courts considering the issue have concluded that constructive discharge is a question of fact and, therefore, have accorded deference to a trial court's determination of the issue. *Cortes,* 977 F.2d at 200; *Hirschfeld,* 916 F.2d at 575; *Steele,* 867 F.2d at 1317; *Huddleston,* 845 F.2d at 905; *Goss,* 747 F.2d at 888–89. Only the Sixth Circuit has expressed apparent disagreement, stating instead that "constructive discharge is, at least partially, a question of law and must therefore be reviewed by this Court *de novo*." *Yates v. Avco Corp.,* 819 F.2d 630, 636 (6th Cir. 1987). Despite its statement in *Yates,* the Sixth Circuit actually has applied the clearly erroneous fact question standard when reviewing the question of constructive discharge in subsequent cases. *Bruhwiler,* 859 F.2d at 421 (applying the clearly erroneous standard of review); *see also Wheeler,* 875 F.2d at 1249 (quoting *Yates,* but applying a clearly erroneous standard); *Henry,* 768 F.2d at 751–52 (stating that the issue of constructive discharge depends upon the facts of each case and applying the clearly erroneous standard of review).

Our reading of the *Yates* decision convinces us that the Sixth Circuit did not reject the proposition that constructive discharge is a question of fact, but was merely pointing out, in that case, the principle that a determination of the issue of constructive discharge involves an application of law to facts. If the trial court correctly states the legal standard, then findings as to whether the facts meet the legal standard are accorded full deference, and in the federal system, will be disturbed only if clearly erroneous. If the trial court misstates the governing law, however, an appellate court need not afford full deference to those factual determinations that depend upon, or incorporate, the erroneous rule of law. *See Daniels,* 937 F.2d at 1269 (discussing the principle in the context of a hostile work environment claim).

■ The Tennessee standard of appellate review applicable to findings of fact by a trial court sitting without a jury is actually a general statement which readily accommodates determinations which require an application of law to fact.[3] Tenn.R.App.P. 13(d) provides that "[u]nless otherwise required by statute, review of findings of fact by the trial court in civil actions shall be *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise." Tennessee law is clear that the presumption of correctness of Rule 13(d) applies only to findings of fact and not to conclusions of law. *Hillsboro Plaza Enter. v. Moon,* 860 S.W.2d 45, 47 (Tenn.App. 1993). It therefore follows that a trial court's conclusions of law are subject to *de novo* review, while a trial court's findings of fact must be afforded a presumption of correctness and not be disturbed unless the preponderance of the evidence is otherwise.

■ Accordingly, we agree with the Sixth Circuit's conclusion that the determination of whether or not a constructive discharge exists requires an application of law to facts and hold that Tennessee appellate courts reviewing a non-jury determination of the issue should apply Tenn.R.App.P. 13(d).

Although the record reflects that the trial court applied the correct legal standard when determining constructive discharge in this case, we agree with the Court of Appeals that the evidence preponderates against the trial court's finding of constructive discharge. The evidence does not establish that Florida Steel knowingly permitted conditions of discrimination in employment so intolerable that

---

3. In the federal system, the clearly erroneous standard of review applies to factual findings made by either a jury or a judge sitting without a jury. Fed.R.Civ.P. 52(a). In Tennessee, factual findings by a judge are afforded a presumption of correctness, but will be overturned if the preponderance of the evidence is otherwise. In contrast, factual findings by a jury are reviewed under a much more deferential standard of review and will be disturbed only if there is no material evidence to support the verdict. Tenn.R.App.P. 13(d); *Humphrey v. David Witherspoon, Inc.,* 734 S.W.2d 315 (Tenn.1987) (workers' compensation case discussing the differences between the two standards of review).

a reasonable person in Campbell's shoes would have felt compelled to resign. Indeed, as we previously concluded, Florida Steel, once notified of the cold-shoulder treatment, promptly made a reasonable effort to remedy the situation, based on the information available. One of the factors which the trial court characterized as "a very substantial and significant reason" for Campbell's resignation was the threats made by her co-worker. Yet, the trial court specifically found that Florida Steel did not know, and had no reason to know, that the co-worker previously reprimanded for harassing Campbell had privately threatened her after the reprimand. Had Campbell informed Florida Steel of those threats, the trial court also specifically found that Florida Steel would have immediately discharged the harassing employee. In addition, Campbell worked only two weeks after the sexually and racially explicit harassment ceased and informed Florida Steel during that period that the situation was improving. Moreover, Florida Steel management personnel tried to dissuade her from her resignation decision through her final day of employment.

Because Florida Steel responded reasonably to the cold-shoulder treatment, and had no knowledge of the threats which the trial court characterized as a "substantial and significant reason" for Campbell's resignation, we conclude that the evidence preponderates against the trial court's finding of constructive discharge. Accordingly, we affirm the judgment of the Court of Appeals.

We cannot end this opinion without emphasizing that we are limited in this appeal to considering the liability of an employer based on the employer's knowledge of and response to its employees' misconduct. The employees' misconduct in this case, as reflected by the record, was totally and completely reprehensible. We condemn in the strongest possible terms the appalling treatment of this employee because of her race and gender.

### CONCLUSION

Having determined that Florida Steel is not liable to Campbell for hostile work environment sexual and racial harassment under either Title VII of the Federal Civil Rights Act or the Tennessee Human Rights Act, and that the evidence preponderates against the trial court's finding of constructive discharge, we affirm the Court of Appeals' judgment dismissing the case, upon the separate grounds stated. Costs of this appeal are taxed to the plaintiff, Brenda Campbell, for which execution may issue if necessary.

DROWOTA, REID, BIRCH and WHITE, JJ., concur.