IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE

# KENNETH MORRIS v. CHRISTOPHER NORWOOD, ET AL.

**Direct Appeal from the Circuit Court for Bradley County**
**No. V-98-410  John B. Hagler, Jr., Judge**

---

**No. E1999-01328-COA-R3-CV - Decided April 24, 2000**

---

The plaintiff sued to rescind a contract by which he agreed to sell his sports trading card business to the defendants. The trial court granted rescission. As a part of its judgment, the court ordered the plaintiff to pay the defendants $2,000. The plaintiff appeals, claiming that the trial court's judgment fails to return the parties to the *status quo* before the sale. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

SUSANO, J., delivered the opinion of the court, in which FRANKS and SWINEY, JJ. joined.

Joe G. Bagwell, Knoxville, Tennessee, for the appellant, Kenneth Morris.

William J. Brown, Cleveland, Tennessee, for the appellees, Christopher Norwood and Kevin Rigdon.

**OPINION**

I.

This action revolves around an oral contract for the sale of a business and its assets. The plaintiff, Kenneth Morris ("Seller"), brought this action seeking to rescind the oral contract by which he agreed to sell his business, "Ken's Kardz," to the defendants, Christopher Norwood and Kevin Rigdon ("Buyers"). Following a bench trial, the lower court ordered Seller to pay Buyers $2,000 in order to return the parties to the *status quo*. Seller appeals, arguing essentially (1) that the trial court did not accomplish *status quo* but instead reformed or rewrote the contract between the parties by calculating the value of inventory using a "normalized profit valuation method," and (2) that a measure of damages based upon the cost of each item in Seller's inventory would be more appropriate to make the parties whole.

Seller had owned a business known as "Ken's Kardz" since 1990. The business involved primarily the selling of collectible sports trading cards. In December, 1997, Seller contacted Buyers and asked them if they would be interested in buying the fixtures, equipment, and card inventory of

the business. Norwood testified that Seller proposed a purchase price of $10,000, with a down payment of $8,000 and monthly payments of $500 thereafter until the full price was paid. Norwood testified that when he told Seller that he and Rigdon could not afford to pay $8,000 in one lump sum, Seller agreed instead to take two monthly payments of $2,500 each as a down payment, followed by monthly payments of $500 until the $10,000 purchase price was paid in full. Seller, on the other hand, testified that he told Norwood that the price would be the amount of the merchandise inventory, at his cost, which Seller estimated to be between $60,000 and $65,000. Seller testified that he told Norwood that he initially wanted $10,000 down, but that he later told him that he would agree to a $5,000 down payment made in two equal installments.

On January 1, 1998, the parties took an inventory of all the merchandise in the store and reduced it to writing. This inventory does not reference the cost of any of the items. Seller later created a computer-generated inventory of the merchandise. The latter inventory reflects Seller's determinations as to the cost of each item. Based upon this document, Seller calculated that the total cost of the inventory -- and hence, according to him, the purchase price of the business -- was $63,695.18. However, Seller did not show the computer-generated inventory to Buyers at that time. In fact, according to Buyers, they were not aware of the $63,000 plus price desired by Seller until May, 1998, when this lawsuit was filed.

Buyers began operating the business in January, 1998. Norwood testified that for the first three months of operation, Buyers were selling "just to survive," that is, to pay the rent and to pay Seller the agreed-upon sum of $2,500 for two months and $500 per month thereafter. Buyers first sought to sell some of the older inventory received from Seller in order to make room for different product lines. Norwood testified that after accomplishing this, their sales increased. Their average monthly sales from January to May, 1998, were from $6,500 to $7,000. During this five-month period, Buyers sold a portion of Seller's old inventory for $9,730.91, with the bulk of the sales occurring in January. Buyers made the two down payments of $2,500 in January and February, 1998; they also thereafter made four monthly payments of $500 each, for a total of $7,000.

In May, 1998, Seller presented Buyers with a written contract stating that the purchase price of the business was $63,695.18. Buyers refused to sign the proffered document, stating that it did not reflect the parties' agreement to sell the business for $10,000. Seller then filed this action seeking possession of the fixtures, equipment, and stock-in-trade of the business; a restraining order to prohibit Buyers from damaging, concealing, or removing Seller's property; rescission of the contract based upon the parties' mutual mistake concerning the purchase price; and damages for those items sold by Buyers. In the alternative, Seller sought damages in the amount of $65,000.[1] The trial court entered a temporary restraining order prohibiting Buyers from damaging, concealing, or removing any of Seller's property from the business.

---

[1]Seller later amended his complaint to seek a declaratory judgment as to whether a valid contract existed between the parties and, if so, whether that contract required Buyers to pay Seller for the cost of the inventory.

At a hearing on Seller's request for possession of the remaining inventory, the trial court ordered Buyers to maintain the items of inventory originally obtained from Seller until an inventory and appraisal could be obtained. The trial court specifically ordered Seller to obtain an appraisal of the inventory still in Buyers' possession. An inventory was taken of the remaining merchandise; thereafter, Buyers returned to Seller the portion of the inventory that had not been sold. Seller, however, failed to obtain an appraisal as he had been ordered to do by the trial court.

Buyers filed an answer, in which they asserted that an oral contract existed but that the contract price was $10,000. Buyers later amended their answer to include a request for the refund of money paid to Seller in excess of the amount of damages due Seller under the contract.

A bench trial was held on May 18, 1999. Seller testified that the inventory returned to him, at his cost, was $16,586.53. Seller further testified that the items sold by Buyers for $9,730.91 had actually cost Seller $47,108.65. He admitted that he had accumulated the inventory over several years, and that he did not factor in depreciation in his calculations. Seller had no opinion about the fair market value of the business or the fair market value of the inventory. It was also shown at trial, as previously indicated, that Seller did not obtain an appraisal of the returned inventory.

On the issue of value, Buyers presented the expert testimony of Ron Arnett, a certified public accountant and a certified valuation analyst. Arnett testified as to the fair market value of the business, the amount of compensation Seller should receive for the portion of his inventory sold by Buyers, and the amount that Seller should be reimbursed for the cost of that inventory. Arnett opined that the fair market value of the business was $12,100. He determined the fair market value by analyzing the business' earnings for the years 1995 to 1997. He opined that the earnings method was "the best method of determining value outside of having an appraisal of inventory...." Arnett explained that he calculated the fair market value by averaging the sales, cost of goods sold, gross profit, expenses, and net income for the years 1995 to 1997, inclusive. He then calculated the percentage of each of these categories in relation to sales:

|  | Three-Year Average | Percentage of Sales |
|---|---|---|
| Sales | $ 48,387 | 100% |
| Cost of Goods Sold | 17,267 | 36 |
| Gross Profit | $ 31,120 | 64 |
| Total Expenses | 24,087 | 50 |
| Net Income | $ 7,033 | 15 |

Next, Arnett determined the average normalized net income of the business for the past three years. Because the business is a sole proprietorship, Arnett adjusted or "normalized" the net income

-3-

listed above to account for a monthly salary for the owner of *approximately* $500.[2] He therefore determined that the Seller had received an average normalized annual net income of $1,333 from 1995 to 1997, *i.e.*, average net income of $7,033 less estimated annual salary for owner of $5,700.

Arnett then calculated the reasonable rate of return on the business' net tangible assets, *i.e.*, the inventory. He explained that this calculation was necessary in order to determine the business' earnings and to determine if there is any goodwill, either positive or negative, in relation to the business. To calculate the reasonable rate of return, Arnett assumed that the total cost of the inventory as set forth in the computer-generated inventory was a reasonable statement of the value of the inventory. He opined that a reasonable rate of return on those assets would be $9,873. Arnett opined, however, that there was approximately $50,000 of negative goodwill in relation to the business, which, Amett explained, means that the business "is just not earning enough money to cause any buyer to think that it's worth what the inventory stated." Arnett thus subtracted the negative goodwill from the assumed value of the net tangible assets to arrive at $13,461, the net estimated value of the business. Arnett then applied a marketability discount rate of 10%, to reflect the costs of selling the business, to arrive at a fair market value of $12,100.

Arnett opined that Seller should be compensated $1,460 for the merchandise sold by Buyers. He arrived at this figure by calculating 15% -- the average percentage of net income for the years 1995 to 1997 -- of $9,730.91, the total sales generated by Buyers from Seller's inventory. He further opined that Seller should be reimbursed $3,503 for the cost of the merchandise. Arnett arrived at this figure by calculating 36% -- the historical average percentage of the cost of the goods -- of the total sales generated by Buyers from Seller's inventory. Arnett concluded that $4,963 -- the net income generated by the sales plus the cost of the goods -- would make Seller whole. Arnett noted, however, that his calculations did not account for the time and effort spent by Buyers in selling the merchandise.

After the parties rested, the trial court announced its findings from the bench as follows:

> There's two theories that the Court is operating on in this case. And, first of all, I'll say this about Mr. Arnett's testimony. It was useful in two respects. First of all, it was a way of evaluating the business as a business, although I know that had nothing to do with this contract, but it's interesting to the Court that his evaluation of the business was certainly in the neighborhood of what...[Buyers] were talking about as being the purchase price in this case. I say it's only useful for that.
>
> The other thing that is most useful about his testimony is, if you assume that there was no meeting of the minds, no contract -- and the Court is being asked to unscramble an egg here, which is very

---

[2]Arnett calculated an annual salary for the owner of $5,700, based upon a three-year average of estimated salary.

difficult. Assuming that there was no meeting of the minds,... [Buyers] came in there, they sold a large number of cards, possibly the best cards, I don't know, because they were trying to generate cash thinking that they had an agreement. That's assuming that there was no meeting of the minds.

And so all of those cards have already been sold....[Seller] came in and recovered some but the Court is asked to do something that I was having a lot of difficulty figuring out a good solution to. But Mr. Arnett's testimony is very helpful there because he put some kind of fair market value figure on what had been transferred.

And I want to say right up front, I just cannot go with the cost values of these things. I'm not saying that that's not the value, but you need to remember the Court ordered an appraisal of these cards, and it was not done. It was not done by...[Seller]. I have to take that into consideration.

But I think that the -- Mr. Arnett's figure of $4,963 makes a lot of sense to me. Which means that under that theory, putting everybody back in place, there being no meeting of the minds, about $2,000 would flow from...[Seller] to...[Buyers]. They've paid $7,000. He says what they did was about $5,000 so they're owed $2,000.[3]

This appeal followed.

## II.

In this non-jury case, our review is *de novo* upon the record with a presumption of correctness as to the trial court's factual findings, unless the preponderance of the evidence is otherwise. Rule 13(d), Tenn. R. App. P.; *Wright v. City of Knoxville,* 898 S.W.2d 177, 181 (Tenn. 1995). The trial court's conclusions of law, however, are not accorded the same deference. *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett,* 860 S.W.2d 857, 859 (Tenn. 1993).

---

[3]As an alternative rationale for its holding, the trial court noted that "$10,000 made sense as a purchase price." Based upon this finding, the trial court reasoned that if the parties indeed had agreed to a $10,000 purchase price, then Seller breached the contract by taking back part of the goods. The trial court concluded $2,000 in damages for Seller's breach of contract would be "lenient." Because the parties agree that rescission is an appropriate remedy, we need not address the propriety of this alternative rationale for the trial court's holding.

We also note that the trial court is in the best position to assess the credibility of the witnesses; therefore, such determinations are entitled to great weight on appeal. ***Massengale v. Massengale,*** 915 S.W.2d 818, 819 (Tenn.Ct.App. 1995); ***Bowman v. Bowman,*** 836 S.W.2d 563, 566 (Tenn.Ct.App. 1991). In fact, this court has noted that

> on an issue which hinges on witness credibility, [the trial court] will not be reversed unless, other than the oral testimony of the witnesses, there is found in the record clear, concrete and convincing evidence to the contrary.

***Tennessee Valley Kaolin Corp. v. Perry,*** 526 S.W.2d 488, 490 (Tenn.Ct.App. 1974).

### III.

As previously noted, the parties agree that rescission is an appropriate remedy in the instant case. Rescission is an equitable remedy involving the avoidance or setting aside of a contract. ***Lamons v. Chamberlain,*** 909 S.W.2d 795, 800 (Tenn.Ct.App. 1993). It is intended to return the parties to the positions they were in prior to the transaction. ***Id.***

Seller contends that the trial court failed to return the parties to their prior positions. Seller argues that by applying the valuation method utilized by Buyers' expert, the trial court "effectively replaced a non-sale contract with a contract to sell [Seller's] inventory using a valuation method based solely on hypothetical figures." Seller argues that the trial court should have instead awarded Seller damages based upon the cost of the inventory not returned, *i.e.*, $47,108.65.

We find and hold that the trial court properly rescinded the contract and returned the parties to their prior positions. The trial court was presented with two methods of calculating the "value" of the inventory not returned to Seller: the cost of the inventory when it was originally purchased by Seller and the valuation method utilized by Arnett as previously set forth in this opinion. Based upon Seller's method of determining value, Seller would require $47,108.65 to be made whole. Based upon Arnett's method, only $4,963 would be required to make Seller whole. Obviously, the evidence presented on the issue of value was sharply conflicting. The trial court resolved this issue on the basis of witness credibility: it found Arnett's method to be "very helpful" in determining the fair market value of the business, which in turn enabled the trial court to determine how to make the parties whole in regard to the inventory that had been sold. The trial court having resolved this matter of witness credibility in favor of Buyers, we cannot say that there is "clear, concrete and convincing evidence to the contrary" in the record to disturb this determination. *See **Tennessee Valley Kaolin Corp.,*** 526 S.W.2d at 490.

We find that the trial court was justified in adopting Arnett's valuation method. Using Arnett's calculations, the trial court awarded Seller a percentage of the sales made by Buyers in order to compensate Seller for the net income and also awarded him what Arnett calculated to be the cost

of the goods sold. These percentages were based upon Seller's historical earnings and expenses. The trial court's award adequately compensates Seller for the net income that he would have recovered had he sold the items himself, and also returns to him the cost of those goods. An award of only net income, rather than gross income, is appropriate because Seller did not incur any expenses in selling this merchandise.

Seller takes issue with the fact that Buyers sold a portion of the inventory for only $9,730.91, when the actual cost of the inventory was $47,108.65. Although we note that this merchandise was sold well below the cost testified to by Seller, we cannot say that the evidence preponderates against the trial court's award in this case. The trial court based its award upon the value of the business and the inventory sold by Buyers. The only evidence presented to the trial court regarding value was the testimony of Arnett. Seller, on the other hand, testified only as to the *cost* of the inventory; he presented no proof regarding the *actual value* of the business and the inventory to contradict the testimony of Arnett. As noted by the trial court, Seller was ordered to obtain an appraisal of the remaining inventory; he failed to do so. Such an appraisal would have facilitated the trial court's efforts to determine the value of the items that had been sold. The evidence does not preponderate against the trial court's judgment.

IV.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant. This case is remanded for enforcement of the judgment and for collection of costs assessed below, all pursuant to applicable law.