# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
August 27, 2001 Session

## IN RE: THE ESTATE OF J. CRAWFORD MURPHY

**Appeal from the Probate Court for Sevier County**
**No. P97-10-506     Jeff D. Rader, Judge**

**FILED DECEMBER 27, 2001**

**No. E2001-01112-COA-R3-CV**

---

In this case the Probate Court held that the personal representative of the Estate of Mae Thompson Murphy did not have authority to dissent from the will of her husband, J. Crawford Murphy, and thereby take an elective share of his Estate. We find that T.C.A. 31-4-105 gives the personal representative this right and reverse the judgment of the Trial Court.

**Tenn.R.App.P. 3 Appeal as of Right; Judgment of the Probate Court Reversed;**
**Cause Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and D. MICHAEL SWINEY, JJ., joined.

John T. McArthur, and Martha S. L. Black, Maryville, Tennessee, for the Appellant, Matthew Thompson

Edward H. Hamilton, Sevierville, Tennessee, for the Appellee, Robert A. Murphy, Executor of the Estate of J. Crawford Murphy

## OPINION

The question presented by this appeal is whether Larry Thompson, who was the Executor of the Estate of his mother, Mae Thompson Murphy, had an absolute right under T.C.A. 31-4-101 and 31-4-105 to take an elective share of the Estate of her husband, J. Crawford Murphy, that his mother would have been entitled to take had she not died.

The facts giving rise to this appeal are not in dispute, and our review is *de novo* without any presumption of the correctness of the Probate Court's findings of fact. Campbell v. Florida Steel Corp., 919 S.W.2d 26 (Tenn. 1996).

Mr. and Mrs. Murphy had been married, at the time of his death on October 8, 1997, for approximately 10 years. Mrs. Murphy died 17 days later, on October 25, 1997. The time had not yet expired for her to seek an elective share of her husband's Estate, although the proof shows that she was incompetent to make such an election.

After her death her son, who was the Executor of her Estate, purported to exercise the elective share on behalf of her Estate.[1] There is no question that his action on behalf of his mother's Estate was timely.

The Statutes in question above referenced state the following:

> **31-4-101. Right to elective share**.–The surviving spouse shall have a right of election to take an elective share of one-third (1/3 ) of decedent's net estate as defined by § 31-2-103(b). Such elective share, when so determined, shall be exempt from the debts and charges of the decedent incurred after April 1, 1977.

> **31-4-105. Death of surviving spouse**. – In the event the surviving spouse dies after the death of the spouse-testator and before the time for dissent expires, the personal representative of the decedent's surviving spouse may, in like manner and every respect, make such election on behalf of such deceased spouse. In like manner, the personal representative may withdraw a demand for an elective share at any time before entry of a final determination by the court.

The Trial Court found that the words 'may, in like manner and every respect," had reference to the preceding Section regarding incompetent spouses, which provides the following:

> **31-4-104. Mental incompetency or minority of surviving spouse.** – When the surviving spouse has been adjudged mentally incompetent as described by title 34, chapters 11-13, or is under the age of eighteen (18) years, at the time the will is admitted to probate, upon a petition filed by a guardian, conservator or next friend of either, within one (1) year from probate, or within any extension period so granted, alleging that it would be to the interest of the survivor to take the survivor's elective share, the court having the proper jurisdiction is empowered to appoint a guardian ad litem and hear proof and to declare or not declare an election, and enter judgment accordingly, subject to appeal.

While such a construction might otherwise be tenable, it appears that the Legislature amended Code Section T.C.A. 31-4-105 to delete the underlined words which applied in earlier legislation:

---

[1] During the course of this litigation Mr. Thompson died and his son, who was his only child and his personal representative, replaced him in this proceeding.

**31-620. Death of surviving spouse before expiration of time for dissent–Powers of personal representative.** – In the event the surviving spouse dies after the death of the spouse-testator and before the time for dissent expires, the personal representative of the decedent surviving spouse may, in like manner and every respect, <u>seek the guidance of the court respecting a dissent, with like authority to the court</u>. (Emphasis supplied.)

In light of this we are satisfied it was the legislative intent that the Probate Court should play no part in determining the right of a personal representative to claim an elective share. Indeed, the Legislature did not in like manner amend the Statute regarding incompetent spouses, which contains language giving the Probate Court the authority to monitor an election.

Moreover, an unreported opinion of this Court, <u>McElroy v. Jones</u>, filed in Jackson on November 5, 1985, and authored by Special Judge Russell, is precisely on point and in accord with our resolution of this appeal.

In that case this Court stated the following:

As codified at T.C.A. § 31-4-105 it presently reads:

In the event the surviving spouse dies after the death of the spouse-testator and before the time for dissent expires, the personal representative of the decedent's surviving spouse may, in like manner and every respect, make such election on behalf of such deceased spouse. In like manner, the personal representative may withdraw a demand for an elective share at any time by entry of a final determination by the court (Footnote omitted.)

When the act as passed and as codified are read together it is clear that the Legislature intended to and did enlarge the power of the personal representative and eliminated any necessity for Court approval of the personal representative's choice.

Accordingly, it is our opinion that a personal representative has the unfettered right to make the election on behalf of the deceased.

Therefore, it must follow that the 'equities' of the case now have no more to do with an election that they would have if the husband were not dead and made the election himself.

Before concluding, we observe that we cannot find one single equity favoring the position of the Appellant, as witness the following excerpts set out in the Appellee's brief, which are fully supported in the record:

The Petitioner/Appellant seeks to assert for himself his grandmother's right to <u>elect</u> against her husband's will. The Petitioner values this elective share at $350,000. The largest asset of the estate against which Petitioner claims is a 75 acre farm which has been in its Murphy family for over one-hundred years. (Emphasis in original.)

. . . .

This appeal involves the Estate of J. Crawford Murphy. A significant portion of his estate consists of a 75 acre family farm which has been in the Murphy family in the excess of one hundred years, as indicated by the Century Farm Certificate filed as Exhibit 20 at trial. The Murphy farm was founded in 1874 as indicated on the Certificate, which is awarded by the State of Tennessee. The Century Farm Certificate, states "To the dedication and perseverance of the founders and heirs of these lands, we owe the basic wealth of Tennessee."

. . . .

Neither John nor Crawford Murphy had any children. As might be expected, they both desired for the family farm to stay in the Murphy family. John and Crawford had a brother, W.M. (Bill) Murphy. Bill Murphy's son was their nephew, Robert A. Murphy. Bill and Robert had worked on the family farm for a number of years. Therefore, in 1986, the three brothers met together at Bill Murphy's house. After the brothers had assembled, they telephoned Robert Murphy to come over and meet with them. When Robert arrived at his father's house, this exchange ensued:

> And Uncle Crawford said, "Bob said you would like to have the family farm." and I said "Yes, I would like to have the farm." He said "Well, if you will pay your brothers or your sisters and cousins some money," he didn't give any amount and I didn't ask any amount, "and then you operate the farm as if it was yours and give me 50 percent of the gross sales until my death, and all the farm is yours."

> And that was perfectly all right, because knowing how my father came in to his part of the farm and how my uncles came into their parts of the farm, I just assumed, you know, hey, I have to pay for what I get, I don't get something for nothing.

As requested, Robert A. Murphy undertook and fulfilled this obligation to operate the family farm and divide the gross proceeds with his Uncle Crawford.

> Q. Okay. And did you fulfill that bargain?

A. I have fulfilled that bargain.

Q. Specifically what did you do to fulfill that bargain?

A. When I sold a load of calves, I took the check by and showed it to Crawford and wrote him a check for half of it.

. . . .

MR. McARTHUR: Are those the checks?

MR. HAMILTON: Yeah. Livestock checks.

. . . .

(Thereupon, Exhibit No. 17 was marked.)

. . . .

Robert Murphy worked the family farm under the agreement with his Uncle Crawford for over ten years.

. . . .

This agreement was beneficial to Crawford Murphy and to his wife, Mae Murphy, as a source of income for them in their older age. Robert Murphy did all of the work and gave half of the gross proceeds to help support his aging uncle and his uncle's wife, Mae, who was in poor health. In contrast, the performance of this agreement was not profitable for Robert Murphy.

. . . .

This agreement was beneficial to Crawford Murphy and to his wife, Mae Murphy, as a source of income for them in their older age. Robert Murphy did all of the work and gave half of the gross proceeds to help support his aging uncle and his uncle's wife, Mae, who was in poor health.

. . . .

J. Crawford was married twice. His first wife was Johnnie King Murphy, a school teacher and librarian in Sevier County Tennessee. They worked and acquired a home on Marshall Street in Sevierville.

Crawford Murphy married Johnnie King in 1935 when he was thirty years old. She passed away from cancer in 1981. They had been married for forty-six years. Crawford was seventy-six years old when Johnnie King Murphy passed away.

J. Crawford Murphy married his second wife, Mae Thompson in 1982. They had dated in their youth and she sent him a sympathy card when his first wife passed away. This was a second marriage for both Crawford Murphy and Mae Thompson. Crawford Murphy was seventy-seven and Mae Thompson was seventy-three when they married. She took his name and became Mae Thompson Murphy.

By all accounts, Mae and Crawford were happy to have been reunited. Helen Allen, who cared for Mae during her illness, stated:

Q.   Tell me during her ill health how Crawford was toward her.

A.   He was very loving and sweet, and he did anything and everything he could to take care of her and make her – her existence easy.

. . . .

Mae Murphy suffered a stroke in 1988, six years after her marriage to Crawford Murphy. She was seventy nine years old. The stroke left her in a severely debilitated state.

. . . .

The expense for health care required by Mae Murphy was extraordinary.

Q.   What kind of nursing care or home health care was required by Mae Murphy after her stroke?

A.   She required a sitter, one that stayed in the daytime, Pauline Owenby and – or Pauline Dorsi – and her daughter, Joy Owenby, stayed at night, and then to give them a off day on the weekends, my sister Helen stayed on Sunday.

Q.   And have you looked over several documents that would indicate what this care cost?

A.   Yes, I have.

Q.   And can you identify this exhibit, please?

A.   Yes.  These are checks regarding her care the last month of Crawford's life.  And the fact of the business is, I wrote three of them.

Q.   Who wrote the others?

A.   J. C. Murphy; Crawford.

Q.   Is his handwriting familiar to you.

A.   Yes, it is.

Q.   Are these checks in his handwriting?

A.   Those checks are in his handwriting.

. . . .

Tell the court, if you will, if you have been able to determine on an annual basis about what the cost of home health care was for Mae Murphy.

A.   On his income tax return, I think he claimed something or another like $33,000 a year, and then probably $1,800 a year from medicines that --

Q.   Would the checks he wrote verify that amount?

A.   Yes.

. . . .

It is clear from the record that extensive care was provided to Mae Murphy by her husband Crawford, and to a large extent by his nephew Robert Murphy and his niece, Helen Allen.  There is no indication in the record that any aid or assistance was ever provided by the Petitioner, his father, or any other member of the Thompson family.

Crawford Murphy passed away on October 8, 1997  from a heart disease.  Mae Murphy passed away seventeen days later, on October 25, 1997, from multi infarct dementia and atrial fibrillation.

On June 9, 1998, a Petition for Elective Share and other relief was filed by Mae Murphy's only son and the sole beneficiary of her residual estate, Larry

Dunn Thompson. Larry Thompson filed the Petition for Elective Share as the Executor of her Will. Shortly thereafter, Mr. Thompson passed away of hepatic failure and cirrhosis of the liver due to excessive drinking.

The day after his father's death, on September 23, 1999, Matthew Thompson filed a Petition in Blount County Probate Court to take his father's place as Personal Representative of his grandmother's estate. Thereafter, Matthew Thompson was enabled to pursue the spousal elective share initially instigated by his father, as was testified to on direct examination of Matthew Thompson.

. . . .

During trial, Matthew Thompson was asked to offer any justification which he might have as to why he should be allowed to take one-third of J. Crawford Murphy's Estate, contrary to Mr. Murphy's testamentary intent. In fact he was asked this question twice and on both occasions could offer no justification.

Q. Have you reviewed the will of Crawford Murphy?

A. Yes, sir, I have.

Q. And that has been filed as an exhibit in this case?

A. (Nods head up and down).

Q. And is it your position that his testamentary intent as stated in that will should not be carried through?

A. Explain what you are asking. You are wanting me to – I don't know what he was thinking.

. . . .

Q. Can you articulate any justification, other than the language of the statute, any argument or basis whereby you should be the beneficiary of a portion of this 75-acre farm as opposed to the designated beneficiaries named in the will?

MR. McARTHUR: Your Honor, I will again object to relevancy.

THE COURT: You are asking, are the equities there to substantiate this? Is that correct?

MR. HAMILTON: I am asking if there is any justification.

THE COURT: Do you understand his question?

THE WITNESS: Yes, I do.

THE COURT: All right. I want you to answer. Go ahead. Overruled.

THE WITNESS: I am exercising the rights I feel are available to me.

. . . .

Q. Did you give consideration to any other factors or set of facts or circumstances other than what you considered to be your statutory rights?

A. No, sir.

As can be seen from the foregoing testimony, Mr. Thompson is relying upon the Latin phrase "SIC LEX SCRIPTA" (Thus the law is written), which enables him to reap where he has not sown.

For the foregoing reasons the judgment of the Probate Court is reversed and the cause remanded for such further proceedings as may be necessary and for collection of costs below which are, as are costs of appeal, adjudged against the Estate of J. Crawford Murphy.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE