IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 28, 2001 Session

## THE ESTATE OF VELMA MONROE RUSSELL v. KNOX COUNTY, TENNESSEE

**Appeal from the Circuit Court for Knox County**
**No. 2-393-98      Harold S. Wimberly, Judge**

**FILED MAY 3, 2001**

**No. E2000-02692-COA-R3-CV**

The Estate of Velma Monroe Russell, which was substituted as a party Plaintiff after the death of Mrs. Russell after the suit was filed but prior to trial, sues Knox County for injuries to her as a result of an automobile accident at a four-way-stop intersection. The Trial Court found the County was guilty of no negligence proximately causing the accident and the injuries to Mrs. Russell. We affirm.

**Tenn.R.App.P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Cause Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and D. MICHAEL SWINEY, JJ., joined.

Samuel W. Brown, Knoxville, Tennessee, for the Appellant, The Estate of Velma Monroe Russell

Wendell K. Hall, Knoxville, Tennessee, for the Appellee, Knox County, Tennessee

**OPINION**

This suit was initiated by Velma Monroe Russell, seeking damages against Knox County, Tennessee, for injuries received in an automobile accident at the intersection of Andersonville Pike and Emory Road in Knox County. During the course of Mrs. Russell's discovery deposition in this case she became ill and died the next day from causes apparently unrelated to the injuries she received in the automobile accident. Her death resulted in this case being revived in the name of her Estate.

The Trial Court found that "the plaintiff has not carried the burden of proof and shown by a preponderance of the evidence that the responsibility of the accident should be placed upon the County,."

The Estate appeals, contending the evidence preponderates against the Trial Court's finding.

The accident occurred on July 24, 1997, at approximately 10:50 a.m. At the time Mrs. Russell was traveling in an easterly direction on Emory Road, approaching its intersection with Andersonville Pike. The intersection is a four-way stop and Mrs. Russell, who had never passed through the intersection before, did not heed the stop sign at the intersection and drove into it at the approximate speed of 25 to 35[1] miles per hour and struck the passenger side of another vehicle which had stopped in obedience to a stop sign on Andersonville Pike and then proceeded in a southerly direction into the intersection.[2]

The discovery deposition of Mrs. Russell, both in this case and in another case growing out of the same action wherein she was the defendant, were introduced in proof. They show that Mrs. Russell never saw the stop sign and proceeded because the vehicle with which she ultimately collided stopped for the purpose in her mind to yield the right-of-way.

It is the theory of the Estate that the County was negligent in not trimming tree limbs and other vegetation which obscured the stop sign from Mrs. Russell's vision. Proof was introduced in the form of photographs made two days after the accident, which shows an obstruction of the sign, although it is clear these pictures were made some distance west of the intersection. The pictures also show that there is a warning sign some distance west of the intersection that a stop sign is upcoming, and also there was in Mrs. Russell's lane of traffic what is known as a "stop bar"—a 24-inch painted white stripe which designates a point where a vehicle "is required to stop" before entering the intersection.[3]

In addition to that proof the County introduced the deposition of Jerry Haggard, who was following Mrs. Russell. He testified as follows:

Q   On this particular date, June 24th, 1997, do you recall seeing that stop sign on that date, June--

A   Yes, sir.

---

[1]      Mrs. Russell stated in her deposition that she was going "around 25 miles an hour" and Jerry Haggard, a witness who was following Mrs. Russell, said her speed was approximately 35 miles per hour. The speed limit for that portion of Emory Road was 40 miles per hour.

[2]      Although the complaint alleges Mrs. Russell was operating her vehicle in a northerly direction and the other vehicle was being operated in an easterly direction, the parties stipulated that the directions are as shown in this paragraph.

[3]      Mrs. Russell's depositions are silent as to whether she observed the sign warning a stop sign was ahead, or the "stop bar" stripe across her lane of travel.

Q   If you would, describe the condition of the stop sign on that date.

A   Clearly visible.  There wasn't nothing blocking the view of that stop sign.

Q   Are you saying that from your usual recollection of that stop sign, from seeing it on a daily basis, or are you recalling that from that exact date, June 24th, 1997?

A   Actually, both, because it was clearly visible.  You know, there's no excuse not seeing it.

          MR. KNIGHT: I didn't hear that.

BY MR. HALL:

Q   Could you repeat that answer?

A    Restate your question again.

Q   When you described the condition of the stop sign, do you recall it from that specific date of June 24th, 1997, or are you recalling that just from your usual experience in driving through that intersection?

A   Well, usually experience.  But like I say, it was clearly visible.

Q   Okay.  So were you able to view that stop sign on the days previous to June 24th, 1997, immediately previous to that date?

A   Yes, sir.

Q   And do you recall the condition of the stop sign on those dates?

A   Clearly visible.

Q   Do you specifically recall seeing that stop sign on June 24th, 1997, on the date of this accident?

A   Yes, sir.  Uh-huh.

Q   Do you recall any vegetation having grown up around that stop sign?

A   No, sir.  Huh-uh.

Q   How far away would you say the nearest vegetation to that stop sign was?

A   Well, there's two cedar trees just a little way down from it, but the county always kept it cut back, trimmed down from the bottom of the trees, so the stop sign was clearly visible at all times. They always kept that trimmed.

Q   Did you drive through there on a daily basis?

A   Yes, sir.

Q   How often would you say prior to this accident the county mowed that area, in your estimation?

A   Well, this time the state, they come through there.  The state took that over from the county, and they do all the mowing now through there, and I believe it was the week before that the state come through there mowing.

MR. KNIGHT: I'd object to the response to the question...not a response.

BY MR. HALL:

Q   Was the sign standing?

A   Yes, sir.

Q   And you saw it standing on that date?

A   Yes.

Q   Was it legible?  Could you read it?

A   Yes, sir.

Q   And you noticed that on this date, June 24th, 1997?

A   Yes, sir.

Q   In your estimation, how far back could you see that stop sign?

A   Probably about a thousand foot.

Upon re-direct examination Mr. Haggard conceded that his testimony of 1000 feet was only an estimate, but that the point the stop sign could be seen from the direction Mrs. Russell was traveling was "along about the first driveway to a church if you're traveling going east on Emory."

At the beginning of the trial the parties stipulated, as best we understand the stipulation, that this distance is 300 feet.

In this non-jury case, our review is *de novo* upon the record of the proceedings below; however, that record comes to us with a presumption that the trial court's factual findings are correct. Tenn.R.App.P.13(d). We must honor that presumption unless we find that the evidence preponderates against the trial court's factual findings. Union Carbide Corp. v. Huddleston, 854 S.W.2d 87 (Tenn. 1993). The trial court's conclusions of law, however, are not accorded the same deference. Campbell v. Florida Steel Corp., 919 S.W.2d 26 (Tenn. 1996).

Our review of the record persuades us that the evidence does not preponderate against the determination of the Trial Court relative to liability of the County. In this connection, we think it significant that one of Mrs. Russell's daughters-in-law, who took pictures two days after the accident, did not take a picture to substantiate her husband's testimony that "It was like kudzu vines hanging down over the stop sign."

For the foregoing reasons the judgment of the Trial Court is affirmed and the cause remanded for collection of costs below. Costs of appeal are adjudged against The Estate of Velma Monroe Russell and its surety.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE