IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON

January 12, 2005 Session

IN THE MATTER OF D. B. (d.o.b. 6/2/01)

STATE OF TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES v.
RAMONA BOKAN AND AIRE THOMAS DAILEY

An Appeal from the Juvenile Court for Benton County
No. 3253      Clyde Watson, Judge

_____

No. W2004-01915-COA-R3-PT - Filed June 13, 2005

_____

This case is about termination of parental rights. The father was incarcerated, and the mother lived in a mobile home in abysmal conditions, with no telephone and no transportation. The child was born on the floor of the mobile home and hospitalized shortly thereafter. Due to the poor living conditions, the State took custody of the child. Over the next three years, the mother and father worked with the Department of Children's Services in an attempt to remedy the conditions that prevented the child's return. These conditions included alcohol and drug abuse and domestic violence. The juvenile court found that the parties continued to engage in physical abuse, and that the mother nevertheless continued to live with the father, creating unsafe living conditions for the child. The juvenile court terminated the parental rights of both parents, finding that the conditions that precluded the child's safe return to the home still persisted after three years and would likely continue. The mother appealed. We affirm, finding that the evidence supports the juvenile court's finding of persistent conditions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S. and DAVID R. FARMER, joined.

Ronald E. Darby, Camden for the respondent/appellant Ramona Bokan

Sharon G. Hutchins, Office of the Attorney General for petitioner/appellee State of Tennessee Department of Children's Services

**OPINION**

On the day the child in this case was born, June 2, 2001, her mother Ramona Bokan ("Mother") lived in a mobile home with no running water, no septic system, and no air conditioning. The mobile home had electrical wires hanging from the ceiling and dog feces on the floor; asphyxiating sewage fumes emanated from the nonfunctioning bathroom, blocked only by a door that Mother had removed from its hinges and placed in the hallway. The child's father, Aire Thomas Dailey ("Father"), lived with Mother but they were not married. Father had an extensive criminal history, including charges for the rape of a child, involving one of Mother's other two daughters.[1] On the day the child was born, Father was incarcerated.

The child, D.B., was born on the floor of that mobile home. Because Mother had no telephone and no transportation, after she gave birth to D.B., Mother walked to a neighbor's house for help. From there, an ambulance transported D.B. to the hospital, where she was placed on a ventilator.

While D.B. was in the hospital, Mother came to the hospital for an overnight stay with her. When Mother arrived, she had been drinking, and the nurses required her to sober up before seeing D.B. During the night, Mother had to be awakened by the nurses to care for D.B.

Mother initially told the DCS investigator, Cindy Curtis ("Curtis"), that she intended to move in with D.B.'s paternal grandmother, Gladys Daily ("Grandmother"). However, when D.B. was ready for release from the hospital, Curtis visited Grandmother's home. Curtis noted that no baby items or necessities had been moved into Grandmother's home and saw no indication that Mother intended to move in with Grandmother. Curtis then sought emergency custody.

On July 13, 2001, when D.B. was a little over a month old, the State of Tennessee, on behalf of the Department of Children's Services ("DCS") petitioned the Juvenile Court of Benton County for temporary protective custody of her. The petition asserted that D.B. was a dependent and neglected child as defined under Tennessee law and that Mother was an improper guardian for her.

By order entered on July 13, 2001, the Benton County Juvenile Court ("Juvenile Court") placed D.B. in protective custody with DCS. After a preliminary hearing on August 14, 2001, the Juvenile Court adjudicated D.B. dependent and neglected and found that removal from Mother's home was the least drastic alternative available. In light of D.B.'s health problems, the Juvenile Court ordered Mother to complete CPR and Apnea Monitor training. Mother was also required to attend vocational rehabilitation counseling, have a neurological psychological evaluation, complete alcohol and drug assessment, and follow the recommendations of the counselors. The Juvenile Court

---

[1]Both of Mother's other daughters had reached majority by the time of trial. The older of the two had lived in Missouri with the maternal grandmother for over ten years, and had met Father once during that time. The younger of the two, the subject of the charge, had lived with the maternal grandmother since she was thirteen years old.

ruled that, if custody of D.B. were returned to Mother, she could not return to her mobile home. Further, the Juvenile Court ordered visitation for Mother.

On August 7, 2001, Mother and Father signed an initial permanency plan ("Plan"). The Plan noted that Mother and Father had had physical altercations in the past and required Mother and Father to attend counseling to resolve relationship conflicts. The Plan required that Mother complete alcohol and drug assessment, receive individual counseling, and receive vocational counseling to enable her to financially support D.B. The Plan required that Father comply with probation after his release from prison, complete alcohol and drug assessment, submit to random drug screens, complete parenting classes, and complete CPR and Apnea monitoring classes. Additionally, the Plan required Mother and Father to maintain a safe and sanitary home and noted that the home would be subjected to random home visits by DCS. DCS made provisions for supervised visitation between Mother and D.B. for at least four hours per month.

In February 2002, Mother petitioned Juvenile Court for overnight visitation with D.B. Mother asserted that she had completed the requirements set out by the court, including parenting classes, drug and alcohol treatment, and counseling sessions. In its March 2002 order, the Juvenile Court ordered that Mother be allowed overnight visitation with D.B. upon completion of a 28-day in-patient alcohol treatment program. The March 2002 order denied visitation to Father.

After a hearing on March 19, 2001, the Juvenile Court granted overnight visitation to Mother. Father was granted visitation, but the court required Mother or Grandmother to supervise Father's visits. The order stated that if visitation were successful, custody would be restored to Mother.

In April 2002, Mother was charged with domestic assault involving Father.[2] Mother spent eighty days in jail for this offense.

In December 2002, DCS filed a petition to vacate the June 2002 order, based on Mother's domestic violence charge. The petition stated that the Juvenile Court had ordered that Mother have no contact with Father, and that Mother had violated that order. The petition noted that Father had admitted to sexually touching Mother's oldest daughter and that Father was charged with, but not convicted of, two counts of rape of a child. Based on Father's admission, DCS asserted, D.B. should not be returned to a home in which Father resides. The petition requested a hearing regarding visitation with revised conditions and limitations or, in the alternative, participation by both parents in intensive counseling to address the substantial risk of sexual abuse.

After a hearing on December 10, 2002, the Juvenile Court denied DCS's petition to vacate the June 2002 order. The Juvenile Court stated that it was impressed with the progress of both Mother and Father. The Juvenile Court then increased visitation with D.B., but required that the

---

[2]The appellate record references several facts related to Mother's domestic assault charge, but does not contain the order revoking Mother's visitation.

visitation be supervised by Grandmother. The court indicated that, if the visitation went well, it would consider returning custody of D.B. to Mother.

Subsequently, Mother was arrested for assaulting Grandmother, in an incident in which she broke Grandmother's hand. In February 2003, the Juvenile Court again revoked Mother's visitation because of the criminal charges against Mother stemming from this assault. On January 1, 2003, Father was incarcerated for reasons not stated in the record. A month later, the court reinstated visitation between Mother and D.B. in D.B.'s foster home.[3]

Also in March 2003, DCS found a new home for Mother, separate from Father, and paid the first month's rent and utility deposit. Shortly after moving into the new home, Mother contacted Father and ended up moving back into Grandmother's house with Father.

In April 2003, Mother and Father signed a revised permanency plan ("revised plan"). (Exhibit 18) The revised plan changed the goal to adoption. The revised plan stated that the goal had changed because of the length of time that the case had been pending, and the fact that Mother continued to be in and out of jail, continued to be involved in domestic violence situations, and had no stable housing and no financial means for caring for D.B. Additionally, the revised plan included objectives for Mother and Father, the achievement of which could have resulted in their regaining custody of D.B. The objectives for Mother included obtaining and maintaining a stable home for D.B., working with a vocational counselor in order to provide financially for D.B., and continuing alcohol and drug treatment. The objectives identified for Father were to stay out of jail, submit to random drug screens, attend Alcoholics Anonymous meetings, and remain drug free. Mother and Father were advised to have no more physical altercations that resulted in injury or police involvement.

Finally, in September 2003, DCS filed a petition to terminate Mother and Father's parental rights. As grounds for termination, DCS alleged persistent unremedied conditions that prevented D.B.'s safe return to their custody, substantial noncompliance with the permanency plan, willful abandonment by Father for failure to visit or engage in more than token visitation for four months immediately preceding the filing of the petition, and willful abandonment by Mother for failure to pay child support.

The Juvenile Court hearing on the termination petition was held on April 27, 2004 and April 29, 2004. Both Mother and Father testified, as well as the DCS caseworker, Terri Prater ("Prater"). In her testimony, Prater acknowledged that Mother had made progress on some requirements in the permanency plan; Mother had received, but had not completed, treatment for alcohol and drug abuse, had received training on Apnea monitoring, and had completed parenting classes. Prater also acknowledged that Father had completed a 90-day drug rehabilitation program. Prater maintained,

---

[3] For reasons that are not apparent in the record, this order states that "the Petition against [Father] is dismissed and . . . [Father] shall have visitation with the child upon his making arrangements with [DCS]." The petition to which it refers is not specified.

however, that Mother and Father's home had remained an unsafe environment for D.B. for three years, despite the services DCS provided, and that the conditions that led to D.B.'s removal still existed. Prater noted that both parents still had alcohol and drug problems and that when Mother and Father engage in physical altercations, Mother was forced to leave Father's house and had no place for her and D.B. to live. Prater testified that, in light of the fact that Mother had been arrested several times for domestic disputes with Father, DCS caseworkers had advised Mother that her chances of regaining custody of D.B. were much better if she separated from Father. Despite the physical abuse from Father, Prater said, Mother defended him, noting that he was D.B.'s father and saying that she wanted them to be a family.

Father testified that he and Mother had been together off and on for about eleven years. Father maintained that he and Mother were getting along better than ever, though he conceded that the police had been called to their house approximately three weeks before the hearing. Father acknowledged that, in the past five years, he had been arrested four to six times as a result of domestic violence. Father asserted that the reason he had not visited D.B. over the last ten months[4] was that he had no transportation to the scheduled visitations. Father could not drive due to poor vision and relied on Grandmother for transportation. In December 2003, however, Grandmother died. She died intestate, survived by Father and his six siblings. Father continued to live in Grandmother's house. Father testified that Grandmother's estate had never been probated, and that he continued to pay the mortgage. He claimed that his brother and sisters were not interested in Grandmother's house.

During her testimony, Mother acknowledged that her two older daughters, now grown, had both left her home in their early teens to live with their maternal grandmother. She admitted that the younger of the two had accused Father of sexual abuse. Mother, however, claimed that her daughter had later told her that the accusation was a lie, and that the daughter had gone to live with the maternal grandmother because Mother and Father "wouldn't let her get away with everything."

Mother admitted that, in May 1998, she was convicted of driving while impaired and, in August 2003, she was convicted of public intoxication. Mother acknowledged that in January 2003 she had pled guilty to assaulting Grandmother and had been under a restraining order as a result of the assault charge. In April 2003, Mother conceded, she was convicted of assault against Father. Mother allowed that Father still drank alcohol. Mother admitted that she had accused Father of assaulting her, but said that she had lied about the alleged assault because she was angry at Father. While acknowledging that her relationship with Father was the cause of many of her problems, Mother testified that she did not intend to leave him.

After the testimony, the trial court judge issued an oral ruling. He found that, although Father stated that he loved D.B., he chose to buy beer rather than a phone card to call his child. The judge noted that at the time of the trial in April 2004, Father had not seen D.B. since June 2003. The trial court found that, if Father had really wanted to visit D.B., he could have found a way to do so. The

---

[4]At the hearing in April 2004, Father testified that he had not seen D.B. since her last birthday on June 2, 2003.

judge then cited Tennessee Code Annotated § 36-1-102, which defines abandonment as a willful failure to visit a child for a period of four months preceding the filing of a petition to terminate the parental rights.[5] The judge found that Father's actions clearly fell within the statutory definition of abandonment, which was grounds for termination of parental rights.

As to Mother, the trial judge first found that Mother "lies whenever it suits her purpose." The trial judge acknowledged that Mother had attended the counseling sessions required by DCS, had visited D.B. and sent her letters, and had tried to be with D.B. whenever she could. However, the trial judge stated that, based on Mother and Father's history and the domestic violence that had occurred only a few weeks before the trial, he had no doubt that the domestic abuse would continue.

The trial court found that the grounds for termination existed pursuant to Tennessee Code Annotated § 36-1-113 (g)(3)(A), noting that D.B. had been removed from the home for a period greater than six months and found that the conditions that led to her removal still persisted and were unlikely to change and prevented her safe return to the care of Mother and Father. The trial judge found that the continuation of the parental relationship greatly diminished D.B.'s chance of early integration into a stable permanent home.[6] Thus, the judge found grounds for termination of Mother's parental rights.

After finding grounds, the trial court determined that termination of parental rights was in D.B.'s best interest. The trial judge cited Tennessee Code Annotated § 36-1-113(i)(1), which states that the court should consider "[w]hether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian." Tenn. Code Ann. § 36-1-113(i)(1). The trial court found that "the parents still drink, that alcohol is used in the home; that the parties still argue; that parties still call the sheriff's department concerning domestic abuse, and they certainly - - that's not in the best

---

[5]Section 36-1-102(1)(A)(i) states that, for the purpose of terminating parental rights, "abandonment" means:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or make reasonable payments toward the support of the child.

T.C.A. § 36-1-102(1)(A)(i) (2001).

[6]The relevant statute states that termination may be based on the following grounds:
The child has been removed from the home of the parent or guardian by order of the court for a period of six (6) months and: (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist; (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.
T.C.A. § 36-1-113(g)(3)(A) (2001).

interest of the child." Pursuant to Tennessee Code Annotated § 36-1-113(i)(2), the trial court also found that the parents had failed to effect a lasting adjustment after reasonable efforts by available social services agencies and that lasting adjustment did not appear possible, noting that despite DCS, Mother had failed to secure suitable housing apart from Father. The trial court observed that Father and Mother were living in Grandmother's house, with no legal title, and that Father's siblings could force them out at any time. The trial judge noted that Mother had maintained contact with D.B. and had established a meaningful relationship with her, but Father had not. Emphasizing the fact that Mother had no intent to live apart from Father, the trial court said:

> There is no hope for these two parties living together. To put a three-year-old back in that condition, that would be the wors[t] thing I could possibly do. . . .
>
> * * *
>
> I . . . find that [Mother] continues to live in the home, continues to have domestic problems with [Father], refuses to leave the home. . . . She has stated that she loves [Father]; I believe that. I believe that she loves [Father] more than she loves the child. She'd much rather be with [Father], in the court's opinion than she had to be with the child. So I'm giving her that opportunity.

Based on this analysis, the judge terminated the parental rights of Mother and Father. From this judgment, Mother now appeals.[7]

On appeal, Mother asserts that the trial court did not have clear and convincing evidence to terminate her parental rights and that DCS did not make reasonable efforts to enable D.B. to return home.

The standard of review of a trial court's decision to terminate parental rights is de novo upon the record with a presumption of the correctness of the findings of fact, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). The trial court's conclusions of law are given no such presumption of correctness. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996).

Termination of parental rights are governed by Tennessee Code Annotated § 36-1-113(c)(1), which requires the court to first find grounds for termination by clear and convincing evidence and then determine by clear and convincing evidence that termination is in the best interest of the child.[8] Tenn. Code Ann. § 36-1-113(c)(1) (2001). In *O'Daniel v. Messier*, 905 S.W.2d 182 (Tenn. Ct. App. 1995), this Court stated that

> [t]he "clear and convincing evidence" standard defies precise definition. While it is more exacting than the preponderance of the evidence standard, it does not require

_____

[7]The notice of appeal in this case was filed by Mother only; Father is not a party to this appeal.

[8]Grounds for termination of parental rights are set forth in Tennessee Code Annotated § 36-1-113(g).

such certainty as the beyond a reasonable doubt standard. Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established.

*O'Daniel v. Messier*, 905 S.W.2d 182 (Tenn. Ct. App. 1995), *superceded by statute on other grounds.*

Mother asserts that the State has not proven its case by clear and convincing evidence. In this case, the trial court judge terminated Mother's parental rights based on the grounds of persistent conditions, pursuant to Tennessee Code Annotated § 36-1-113 (g)(3)(A). Mother argues that D.B. was removed from her home due to the filthy conditions of the home into which D.B. was born. Mother notes that she left this home and moved in with Grandmother as directed by DCS, so this ground is not applicable. The statute, however, states that grounds for termination are established not only if the original conditions which led to removal still exist, but also if "other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) . . . still persist. . . ." There is ample evidence to support the trial court's conclusion that Mother had failed to establish a home and financial stability apart from Father, and that so long as Mother and Father were residing together there would be drinking and domestic problems in the home. Clearly this precludes the safe return of D.B. to their care.

Mother asserts that she completed the permanency plan. Clearly Mother made significant efforts and in fact completed portions of the plan's requirements. However, the trial court noted that Mother failed to complete significant portions of the permanency plan, most notably those addressing the domestic abuse issue. The evidence clearly supports the finding that domestic abuse still continues three years after D.B. was taken into state custody. As such, we find no error on this issue.

Mother asserts the DCS did not make reasonable efforts to return the child to the home, as required by Tennessee Code Annotated § 37-1-166. Specifically, Mother argues that DCS did not make a reasonable effort to relocate her. The record shows that DCS relocated Mother to her own home and paid rent for one month and the utility deposits. After this, Mother returned to Grandmother's house to live with Father. DCS then suggested that Mother move to Missouri and live with her mother. Mother claimed that there was not enough room for her in Missouri. However, the trial court judge did not believe Mother's assertion, finding that she "lies whenever the opportunity should present itself." The trial court's credibility determination and its factual finding are well supported by the evidence. Under all of these circumstances, we must conclude that the trial court did not err in finding by clear and convincing evidence that grounds for terminating Mother's parental rights existed and that such termination was in D.B.'s best interest.

The decision of the trial court is affirmed. Costs of this appeal are taxed to Appellant, Ramona Bokan, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE