IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Submitted on Briefs, September 4, 2014


**BOBBY W. MCEARL, ET AL. v.
TALMO JOHNSON, ET AL.**


**Appeal from the Chester County Chancery Court
No. 2012CV601    James F. Butler, Chancellor**

_____


**No. W2014-00274-COA-R3-CV - Filed October 8, 2014**

_____


This appeal arises from a boundary line dispute. The parties contest the location of the common boundary line between their respective properties. Appellees argue that the boundary line lies at the center of the creek that runs between the parties' properties. Appellants contend that the boundary lies on the creek's east bank. Both sides proffered expert testimony to prove the boundary location. The trial court found Appellees' expert credible. Based on the testimonies of Appellees' expert and their predecessor in title, and the deeds submitted into evidence, the court determined that the boundary line was located along the centerline of the creek. The trial court also awarded damages to Appellees based on Appellants' removal of timber from the disputed area. Appellants appeal. Because the evidence does not preponderate against the trial court's findings, we affirm and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is
Affirmed and Remanded**

KENNY W. ARMSTRONG, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

John E. Talbott and G.W. Sherrod, III, Henderson, Tennessee, for the appellants, Talmo Johnson, Mary Sue Johnson, and the Talmo Johnson Trust.

Terry Abernathy, Selmer, Tennessee, for the appellees, Bobby W. McEarl and Sarah L. McEarl.

1

# OPINION

During the 1950s and early 1960s, Talmo Johnson and his wife, Mary Sue (the "Johnsons"), acquired several tracts of adjoining land in Chester County, Tennessee. The Johnsons consolidated the separate tracts into one farm. Later, the Johnsons sold part of their land to Elbert Brooks by warranty deed dated January 18, 1969. The land conveyed to Mr. Brooks was located southeast of the parcel that the Johnsons retained. The warranty deed from the Johnsons to Mr. Brooks states that the parcel would be "generally bounded. . . by the Jacks Creek Canal." The Jacks Creek Canal ("Jacks Creek") forms the western and northern borders of Mr. Brooks's property and the southeastern border of the Johnsons's property. Sometime prior to Mr. Brooks's acquisition of the property, Mr. Johnson erected a barbed-wire fence on the east side of Jacks Creek. Mr. Brooks and the Johnsons never disputed their common boundary line. Mr. Brooks subsequently sold his land to Bobby and Sarah McEarl (the "McEarls," or "Appellees") by warranty deed dated March 9, 1999. This deed also employed the language that the parcel would be "generally bounded . . . by the Jacks Creek Canal." The controversy over the location of the common boundary line between the McEarls' property and the Johnsons' property began as early as 2005, when Mr. McEarl encountered hunters on his property. The hunters claimed that Mr. Johnson had given them permission to enter the property. Mr. McEarl contacted Mr. Johnson and requested that he stop telling hunters they could cross Jacks Creek. Mr. Johnson complied, and the problem with hunters crossing the creek ceased.

In 2006, Mr. Johnson conveyed, *via* quitclaim deed, his property to the Talmo Johnson Trust (together with the Johnsons, "Appellants"). This deed contained more specific calls and descriptions than the warranty deeds that had been used to transfer the property from Mr. Brooks to the McEarls. The quitclaim deed stated that the boundary was "to a point in the southeast bank of Jacks Creek," rather than "generally bounded. . . by the Jacks Creek Canal" as appeared in earlier deeds.

The instant lawsuit arose after Mr. McEarl discovered that trees had been removed from the east bank of Jacks Creek without his consent. On April 2, 2012, the McEarls filed suit against the Appellants in the Chancery Court of Chester County, alleging damages for the timber that had been cut. On April 30, 2012, Appellants filed their answer to the complaint. Concurrent with the answer, Appellants filed a counter-complaint against the Appellees, asking the court to establish the boundary line between the McEarls' property and the Johnsons' property as the "upper east bank" of Jacks Creek. On August 29, 2012, Appellees filed their answer to the counter-complaint.

2

The court held a bench trial on June 19, 2013 and November 1, 2013.[1] The evidence adduced at the hearing was as follows:

Elbert Brooks testified on behalf of the McEarls. Mr. Brooks purchased roughly 340 acres from the Johnsons in 1969. Before finalizing the sale, Mr. Brooks testified that he had asked Mr. Johnson where the boundary line between the properties was located. Mr. Johnson responded that the boundary line was the centerline of Jacks Creek. However, there were no witnesses to this exchange. In 1999, Mr. Brooks sold his property to the McEarls. Mr. Brooks testified that after the instant lawsuit had been filed, Mr. Johnson came to his house to discuss the boundary line. At that time, Mr. Brooks reminded Mr. Johnson that they had set the property boundary as the centerline of Jacks Creek at the time of transfer.

Sammy Hill, a self-employed equipment operator, testified for the Appellees. In April 2011, Mr. Johnson hired Mr. Hill to "clean the ditch bank" in order to enable Mr. Johnson to repair his barbed-wire fence. Mr. Hill testified that Mr. Johnson directed him to remove timber from the creek bank. Following Mr. Johnson's directive, Mr. Hill testified that he clear-cut the area, removing some three-to-five truckloads of logs. Although Mr. Hill characterized the quality of the lumber as "below average," he testified that Mr. Johnson had instructed him to take the wood to Price's Sawmill in Selmer, Tennessee. Mr. Hill received roughly $4,500 from Price's Sawmill for the lumber. Mr. Hill further testified that Mr. Johnson had instructed him to give half of the proceeds from the first load of logs to Mr. McEarl. However, when Mr. McEarl discovered that the timber had been removed, he told Mr. Hill to stop work until Mr. McEarl could speak with Mr. Johnson. In June 2011, Mr. Hill resumed his work at Mr. Johnson's request, and assumed that any controversy between the parties had been resolved. On cross-examination, Mr. Hill reiterated his belief that Mr. Johnson owned the land where the disputed timber was located. However, he also testified that he knew the land was not owned by Mr. Johnson. In this regard, Mr. Hill contradicts his own testimony. Mr. Hill also explained that there were several places where it was hard to locate the fence, and that some sections of fence were located on the bank of Jacks Creek, while other sections were located in Jacks Creek.

Rish Young, a forester and timber buyer, also testified on behalf of the Appellees. In 2009, Mr. McEarl contacted Mr. Young regarding the sale of timber, and Mr. Young bought the timber rights to roughly 130 acres of the McEarls' land. In 2009 and 2010, Mr. Young harvested the timber stands on the McEarls' property. Mr. Young testified that he was

---

[1] There is no explanation in the record for the lapse between the hearing dates.

directed by Mr. McEarl to leave a "streamside management zone" next to Jacks Creek,[2] and that he did not harvest any trees within a sixty-six foot strip bordering the creek. Mr. Young characterized the trees in this streamside management zone as "good timber" and also noted that "the oak was exceptional."

Wade McMahan testified on behalf of the Appellees. Mr. McMahan is a private forestry consultant retained by Mr. McEarl to determine the value of the timber that was removed from the streamside management zone. Mr. McMahan surveyed the area using accepted industry practices and determined the average value of the removed timber was $6,239.06, and the high value of the timber would have been $7,523.58.

Bobby McEarl testified that he had known Mr. Johnson since he was a child and had worked for him as a plumbing contractor. He testified that in the fall of 2010, Mr. Johnson called him and demanded that he remove the trees from the east bank of Jacks Creek. Mr. McEarl questioned whether Mr. Johnson actually owned any land on the east bank. Mr. Johnson allegedly agreed that he did not own anything on the east bank, but regardless he was going to have workers remove the trees. Mr. McEarl objected, and there was not another discussion about tree removal until April 2011, when Mr. McEarl discovered Sammy Hill removing trees. As noted above, Mr. McEarl confronted Mr. Hill, who explained he was working at Mr. Johnson's direction. Sometime later, Mr. Johnson telephoned Mr. McEarl and explained that Mr. Hill was going to give Mr. McEarl half of the proceeds from the timber. Mr. McEarl stated that he was not going to take any money for the timber, and that he did not see why he should be paid for half of what he already owned in full. When Mr. McEarl went to Mr. Johnson's farm to speak with him about the situation, Mr. Johnson allegedly threw a $700 check at him. In response to this exchange, Mr. McEarl contacted counsel. Mr. McEarl also notified the Tennessee Department of Environment and Conservation regarding Mr. Johnson's removal of the timber from the streamside management zone.

Tony Johnson, the Johnsons' son, testified on behalf of the Appellants. Tony Johnson owns property adjoining both the Johnsons' property and the McEarls' property. Tony Johnson testified that he grew up on the Johnsons' farm, and the barbed-wire fence had been in existence his entire life. On cross-examination, Tony Johnson admitted that he had told Mr.

---

[2] A streamside management zone, also referred to as a riparian corridor, is prescribed by the Tennessee Department of Agriculture, Forestry Division's Best Management Practices for the maintenance of streams. Specifically, streamside management zones "filter sediment and nutrients from overland runoff, allow water to soak into the ground, protect stream banks and lakeshores, provide shade for streams and improve the aesthetics of forestry operations." Tennessee Department of Agriculture, Forestry Division, Guide to Forestry Best Management Practices 14 (2003), *available at* http://www.tn.gib/agriculture/publications/forestry/BMPs.pdf.

4

McEarl that his father had made a mistake when he sold the property to Mr. Brooks. Tony Johnson explained that "where dad had messed up [was in] not reserving enough of the bank to actually be able to put a fence." He also agreed that his father had failed to reserve the entire creek for himself when he sold the property to Mr. Brooks.

Appellant Talmo Johnson testified that he had previously owned the McEarls' property. Mr. Johnson explained that at the time he sold this property to Mr. Brooks, he had "tried to make it plain and clear that [he] would not sell it without putting a fence on the bank of [Jacks Creek]." Mr. Johnson elaborated that he "would [have] been out of water if [he] hadn't kept [the creek]." Mr. Johnson stated that when he sold the property, he understood that he would be setting the boundary line, and he intended for the entirety of Jacks Creek to remain in his possession. Mr. Johnson also testified that he would not have put the fence on someone else's property, and that he did not make any agreements that would have set the boundary anywhere other than along the fence. Mr. Johnson did not conduct a survey of the land when he sold it to Mr. Brooks, and no one disputed the boundary line until the instant case arose. Throughout these proceedings, Mr. Johnson has maintained that he did not have any agreements with Mr. Brooks regarding the boundary line.

Mr. Johnson stated that he hired Sammy Hill to clear the east bank of the creek in order to build a fence that would keep cattle on his side of the property, and he gave Mr. Hill instructions not to cut any trees beyond the fence. Mr. Johnson stated that he did not receive any money from the timber that was taken to Price's Sawmill. Instead, he indicated that the money from the timber was used to pay Mr. Hill for his work. Mr. Johnson also testified that he wanted to give Mr. McEarl some of the proceeds, but he rejected his check. Mr. Johnson did not personally supervise Mr. Hill's work, but he did expect his instructions to be followed. Mr. Johnson described the trees that Mr. Hill removed as "pulpwood." Mr. Johnson acknowledged that he received a letter from the Tennessee Department of Conservation stating that he was in violation for clearing a streamside management zone, but he did not receive any further citation or penalty from the department.

On cross examination, Mr. Johnson denied asking Mr. McEarl to cut the timber on the creek bank in order to repair the fence, and he also denied telling Mr. McEarl he was going to hire someone to cut the timber on Mr. McEarl's behalf. Mr. Johnson also denied that Mr. Hill informed him that Mr. McEarl had demanded that the timber not be removed. Mr. Johnson admitted that he did not do anything to come into compliance with the Department of Environment and Conservation's notice, but that the streamside management zone had re-vegetated on its own.

Greg Perry testified as an expert on behalf of the Appellees regarding the survey he conducted of the McEarls' property. In preparing his survey, Mr. Perry relied on the deeds

from Mr. Johnson to Mr. Brooks and from Mr. Brooks to the McEarls. Mr. Perry's survey located the boundary line at the centerline of the Jacks Creek. Mr. Perry based his determination, in part, on his interpretation of the words "bounded by Jacks Creek Canal," which were found in both deeds. Mr. Perry testified that had the deeds read "to the Jacks Creek Canal," this language would not have changed his determination of the location of the boundary line. Mr. Perry admitted there was no reference to the centerline of Jacks Creek in the deeds, but he also noted that there was no reference to the fence in any of the deeds. Although he testified that he was aware of the quitclaim deed from Mr. Johnson to the Talmo Johnson Trust, Mr. Perry indicated that he had not relied on that deed when preparing his survey. Mr. Perry explained that while the quitclaim deed had very detailed descriptions, he could not locate the surveyor who had prepared it. Furthermore, he testified that it was his practice to rely on older deeds rather than newer ones when preparing survey plats.

Daryl Isbell, a registered land surveyor, testified as an expert witness for the Appellants. Although Mr. Isbell did not prepare his own survey, he testified that he had physically visited the properties, had researched the deeds, and had examined Mr. Perry's survey. Mr. Isbell testified that he would not have located the boundary line in the centerline of Jacks Creek because the words "bounded by" typically mean near, as opposed to the center of something; therefore, he would have relied on the deed from Talmo Johnson to the Talmo Johnson Trust and would have located the boundary line on the east bank of Jacks Creek.

On December 31, 2013, the trial court issued a letter ruling in this matter. This ruling was incorporated, by reference, into the final decree and judgment, which was entered on January 16, 2014. Therein, the court set the common boundary line between the two properties as the centerline of the Jacks Creek and rendered judgment in favor of the Appellees in the amount of $13,762.64 for the timber that had been removed.

Appellants appeal. They raise two issues for review as stated in their brief and slightly modified below:

> 1. Whether the trial court erred in finding that the center of Jacks Creek constitutes the true boundary line between the adjoining properties.
>
> 2. Whether the trial court erred in finding that the Appellants had cut timber belonging to the Appellees and, thus, erred in awarding the Appellees damages in the amount of $13,762.64.

This case was tried by the court without a jury. The general standard of review for bench trials applies to boundary disputes. *See **Thornburg v. Chase**, 606 S.W.2d 672, 675 (Tenn.

Ct. App.1980). Our review, therefore, is *de novo* upon the record of the proceedings below with a presumption of correctness as to the findings of fact of the trial court. *See* Tenn. R. App. P. 13(d); **Boarman v. Jaynes**, 109 S.W.3d 286, 289-90 (Tenn. 2003). The judgment of the trial court should be affirmed, absent errors of law, unless the preponderance of the evidence is against those findings. **Bogan v. Bogan**, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to *de novo* review with no presumption of correctness. *See* **Campbell v. Florida Steel Corp.**, 919 S.W.2d 26, 35 (Tenn. 1996); **Presley v. Bennett**, 860 S.W.2d 857, 859 (Tenn. 1993).

"In resolving a boundary line dispute, it is the role of the trier of fact to evaluate all the evidence and assess the credibility of the witnesses." **Mix v. Miller**, 27 S.W.3d 508, 514 (Tenn. Ct. App. 1999) (citing **Norman v. Hoyt**, 667 S.W.2d 88, 91 (Tenn. Ct. App.1983)). The judgment of the trial court should be affirmed, absent errors of law, unless the preponderance of the evidence is against those findings. **Phillips v. Woods**, No. E2007–00697–COA–R3–CV, 2008 WL 836161 (Tenn. Ct. App. Mar. 31, 2008). Due to the fact-intensive nature of boundary line disputes, the trial court is best suited to assess the credibility of the witnesses, and its credibility determinations are binding on this Court unless the evidence preponderates against them. *Id*. at *34. When the trial court makes a determination accepting one surveyor's findings over that of another, that same deference requires this Court to accept the trial court's findings. *Id*.

As noted in the case of **Hong v. Foust**, No. E2011–00138–COA–R3–CV, 2012 WL 388448 (Tenn. Ct. App. Feb. 8, 2012), the following rule has been adopted in Tennessee:

> The construction of deed and other instruments and documents and their legal effect as to boundaries is a question of law. What boundaries the grant or deed refers to is a question of law; **where those boundaries are on the face of the earth is a question of fact**. If, therefore, the evidence concerning the location of the true boundary line between adjacent landowners is conflicting, that issue is one of fact unless the legal construction of the deed or grant is such that the boundary is determined as a matter of law.

*Id.* at *5 (citing 12 Am. Jur. 2d Boundaries § 121 (1997) (footnotes omitted)) (emphasis added). Therefore, we review the trial court's finding as to the true location of the parties' common boundary line as a finding of fact that is entitled to the presumption of correctness. Tenn. R. App. P. 13(d). Thus, we will not disturb the trial court's judgment unless the evidence preponderates against it. *Id*.

7

## Location of the Common Boundary Line

In its December 31, 2013 ruling, the trial court made the following, relevant findings concerning the location of the common boundary line:

> 1. There is no deed reference or deed wording referring to the fence on the Jacks Creek canal.
> 2. Surveyor Perry used the center of the canal because that was his interpretation of the deed words "bounded by the Jacks Creek canal." The Court finds this is a reasonable interpretation of those words.
> 3. The Quit Claim Deed from Talmo Johnson to himself as Trustee which shows the disputed line to be on the south side of the canal is a self-serving statement in the deed and would not bind the Plaintiffs, and that those words do not have the strength to unilaterally set the line in contravention to the actual deed from Johnson to Brooks, and Brooks to McEarl.

4. All deeds, except the Johnson Trust deed called for the line between McEarl and Johnson to be "bounded by the Jacks Creek Canal."

> 5. Elbert Brooks, who has no stake in the outcome of this matter one way or the other, testified Johnson said to him at the time he was purchasing the property, that the line was in the center of the canal. The Court further finds that Mr. Brooks was credible when he said the barbed wire fence was attached to trees on the bank of the canal for the most part.
> 6. There is no evidence before the Court to lend credence to Mr. Johnson's opinion that he owns to the top of the bank and to the fence that was up there, other than his testimony. In light of the actual deed description, the Surveyor's interpretation, and the testimony of Mr. Brooks, the Court finds the line between Mr. Johnson and Mr. McEarl is the center of the Jacks Creek canal.
>
> \*                                   \*                                   \*
>
> 8. The Court rejects Surveyor Isbell's statement that the Quit Claim Deed from Mr. Johnson to himself as Trustee is relevant in establishing the boundary line between Johnson and McEarl, specifically finding that it is not relevant and is a self-serving statement, and in contravention of established deeds describing that line.

On appeal, Appellants contend that the trial court erred in setting the common boundary line at the centerline of Jacks Creek. They argue that the evidence only supports a finding that the common boundary line lies along the east bank of Jacks Creek. In support of this contention, Appellants make three arguments: (1) that the boundary was set by Mr. Johnson's intent; (2) that the Johnsons and Mr. Brooks established the boundary on the east bank of Jacks Creek by agreement, or by Mr. Brooks's acquiescence; and (3) proper interpretation of the deeds requires that the boundary be set along the east bank of Jacks Creek. We now turn to examine each of these arguments.

### A. Mr. Johnson's intent.

The crux of Appellants' argument on this point is that because Mr. Johnson was the original owner of both properties, he is in the best position to know the location of the boundary line. Furthermore, Appellants contend that because Mr. Johnson was in the cattle business, he would not have located the boundary line in the center of Jacks Creek. Rather, he would have logically located it on the east bank of Jacks Creek in order to maintain control over the water for his livestock. Accordingly, Appellants argue that Mr. Johnson's testimony should be afforded "great credibility" by this Court. The fallacy in Appellants' argument, however, is that this Court will not evaluate the credibility of the witnesses as that is the purview of the trial court. *Phillips*, 2008 WL 836161, at *34 (stating that due to the fact-intensive nature of boundary line disputes, the trial court is best suited to assess the credibility of the witnesses, and its credibility determinations are binding on this Court unless the evidence preponderates against them). The question before this Court is whether the evidence preponderates against the trial court's determination of the location of the boundary line.

From its ruling, it is clear that the trial court gave credence to Mr. Brooks's testimony. Specifically, the court noted:

> Brooks testified that he and Johnson went out to the property and while negotiating [the sale], he asked Johnson where the line was, and he testified Johnson said "center of the canal" was the line. . . . Brooks testified he did not object to Johnson using the creek to water his cattle. Brooks testified he also had cattle, but did not need the creek water since he had water elsewhere.

In addition, the court cites Mr. McEarl's testimony that "Johnson told [Mr. McEarl] he did not own anything across the canal except the fence." As noted above, the trial court also heard testimony from Tony Johnson, who testified that "where dad had messed up [was in] not reserving enough of the bank to actually be able to put a fence."

9

Although Mr. Johnson testified that when he sold the property, he understood that he would be setting the boundary line, and he intended for the entirety of Jacks Creek to remain in his possession, the testimonies of Messrs. Brooks, McEarl, and Tony Johnson contradict Mr. Johnson's testimony. Not only can this Court not give more credibility to Mr. Johnson's testimony than the trial court did, but the evidence also preponderates against Mr. Johnson's testimony. For these reasons, we conclude that Mr. Johnson's testimony is insufficient to overturn the trial court's ruling on the location of the boundary line.

Appellants next turn to the location of the barbed-wire fence, arguing that Mr. Johnson's intent in erecting this fence was to establish the boundary line on the east bank of Jacks Creek. Appellants cite the case of **Overton v. Davis**, No. E2006-01879-COA-R3-CV, 2007 WL 4207918 (Tenn. Ct. App. Nov. 29, 2007) for the proposition that a partition fence can establish a boundary between properties if that is the intent of the parties. Concerning the significance of fencing in a boundary dispute, the **Overton** Court stated:

> Whether a fence will constitute a boundary will depend on the intention of the parties and the significance they attach to the fence rather than its location or condition. The parties must intend the fence to establish the boundary and not serve as a mere barrier. A fence may be maintained between adjoining proprietors for the sake of convenience merely, and without intention of thereby fixing boundaries, in which case mere acquiescence by adjoining land owners in its existence and the occupancy of the land on either side of it do not, in themselves, constitute proof that the fence is on the accepted boundary line so as to constitute a boundary. Thus agreement to or acquiescence in the establishment of the fence, not as a line marking the boundary, but as a line for other purposes, or acquiescence in the mere existence of the fence or in the fence as a mere barrier, does not preclude the parties from claiming up to the true boundary line.

*Id*. at *7 (quoting 12 Am. Jur. 2d Contracts § 90 at 490-91 (1997)).

Concerning the fence, in its ruling, the trial court states:

> Brooks testified that in 1969, there was a partial fence on the canal bank to keep Johnson's cows from coming onto his property. Brooks testified it was partially up and partially down, 99% of it attached to trees on the bank, and that Brooks did

some patching on it himself. . . . He testified the partial fence was there from the beginning when Johnson told him the line was the center of the canal. Bobby McEarl testified the fence was a "piece of junk", in pieces, and not complete. . . . McEarl testified that Johnson told him he did not own anything across the canal except the fence.

\*                \*                \*

Talmo Johnson testified he intended to keep the canal when he sold the property to Brooks and thought the new line was to be on the top of the bank on the east/south side of the canal. He testified that he and Brooks never had any disagreements over the fence. He said he always kept the fence up at his expense and would not have sold to Brooks without keeping the canal and enough land to the top of the bank to put a fence up. . . .

Johnson testified he told Brooks he would put the "line fence" on top of the bank. Brooks denied this. . . .

Again, we cannot give more credence to Mr. Johnson's testimony than allowed by the trial court. Regardless, from its ruling, it does not appear that the trial court based its determination of the proper boundary line on the location of the fence. As noted in **Overton**, the existence of a fence does not, *ipso facto*, create a boundary line. We glean from the record that the subject fence does not lie completely along the east bank of the creek. Rather, as noted by Mr. Brooks "it was partially up and partially down, 99% of it attached to trees on the bank." In this regard, even if we allow that the fence could constitute the common boundary line, its location (being part in the creek and part on the bank) does not support either side's argument concerning the proper location of the boundary line. In fact, only Mr. Johnson's testimony indicates that the fence is the proper boundary between the properties. However, his testimony is disputed by the testimony of Mr. Brooks, *supra*. Mr. Brooks's testimony, coupled with the meandering location of the fence, supports the trial court's determination that the fence does not establish the proper boundary line. Rather, we conclude that the location of the fence, as was the case in **Overton**, was a matter of "convenience," and did not "constitute proof that the fence is on the accepted boundary line." **Overton**, 2007 WL 4207918 at \*7. Here, the preponderance of the evidence indicates that the purpose of the barbed-wire fence was to prevent Mr. Johnson's cows from entering the adjoining property, while allowing the animals access to the water from Jacks Creek. In this regard, the fence is one erected for "convenience." "Thus agreement to or acquiescence in

11

the establishment of the fence, not as a line marking the boundary, but as a line for other purposes, or acquiescence in the mere existence of the fence or in the fence as a mere barrier, does not preclude the parties from claiming up to the true boundary line." *Id*.

## B. Boundary Line Established by Agreement between Johnson and Brooks, or by Brooks's acquiescence.

Appellants also contend that Mr. Johnson and Mr. Brooks agreed that the common boundary line would follow the fence on the east bank of Jacks Creek. Specifically, Appellants argue that the location of the fence indicates Mr. Johnson's intent for the boundary to be on the east bank of Jacks Creek, and Mr. Brooks's failure to contest the placement of the fence indicates his acquiescence. As previously discussed, the *Overton* case undermines Appellants' argument on this point. The location of the fence does not, *ipso facto*, delineate the common boundary line. This is especially true in cases where the intent for erecting the fence was for convenience. From the totality of the circumstances, it appears that Mr. Johnson erected the fence as a means of controlling his cattle and not as a means of establishing a boundary between his property and the McEarls' property.

Furthermore, Mr. Brooks's testimony that Mr. Johnson told him that the centerline of Jacks Creek was the boundary clearly disputes Mr. Johnson's testimony that the boundary was along the creek's east bank. Again, in bench trials, credibility findings are solely within the purview of the trial court. Here, the trial court's ruling clearly indicates that it found Mr. Brooks's testimony more credible than Mr. Johnson's on this point:

> Elbert Brooks, who has no stake in the outcome of this matter one way or the other, testified Johnson said to him at the time he was purchasing the property, that the line was in the center of the canal. The Court further finds that Mr. Brooks was credible when he said the barbed wire fence was attached to trees on the bank of the canal for the most part.
>
> There is no evidence before the Court to lend credence to Mr. Johnson's opinion that he owns to the top of the bank and to the fence that was up there, other than his testimony.

In light of this credibility finding, and considering the evidence in the record, we cannot conclude that the trial court erred in accepting Mr. Brooks's testimony over Mr. Johnson's on the question of the location of the boundary line. Moreover, it does not appear that Mr. Brooks acquiesced to the fence being the common boundary line, but merely acquiesced to Mr. Johnson using this fence as a convenient way to keep his cows from straying onto the

12

adjoining property, while allowing them access to water. As noted by the trial court: "Brooks testified that he did not object to Johnson using the creek to water his cattle. . . ."

## C. Deeds

It is clear from its ruling that the trial court relied primarily upon the Perry survey in setting the boundary line along the centerline of Jacks Creek. Before specifically addressing the Perry survey, the trial court first discussed the deed from the Johnsons to Mr. Brooks. This deed referred "to the boundary as 'encompassed by a three strand barbed wire fence on all sides except that portion of the same which is bounded by Jacks Creek canal and the Sweet Lips Road.'" Mr. Brooks, of course, sold the tract to the McEarls. The court noted that the "McEarl deed used the same legal description as the deed from Johnson to Brooks. Both deeds refer to the boundary as the Jacks Creek Canal."

The trial court then addressed the Perry survey. As noted by the court in its ruling, Mr. Perry testified "that if the tract is 'bounded by' the canal, it means to the center of the canal." Mr. Perry further testified that he had found an iron pin on the top east bank of Jacks Creek, but opined that "it is not normal to set a pin in [a] canal [because] it could get lost." In other words, finding a pin on the east bank of Jacks Creek is not sufficient proof that the boundary runs along that bank.

The trial court discounted the deed from the Johnsons to the Talmo Johnson Trust. This quitclaim deed, admitted as Trial Exhibit 6, refers to the disputed boundary as "a point in the southeast bank of the Jacks Creek Canal and in the northwest line of a tract belonging to Elbert Brooks." Mr. Perry testified that this deed was "self-serving," that it was only "a quitclaim deed," and that he could not "determine[] who surveyed and prepared the description." Based upon Mr. Perry's testimony, which the court found credible, the court noted that "[a]ll deeds but Mr. Johnson's deed to himself as Trustee call for the boundary as 'bounded by the Jacks Creek Canal.'" Although the Johnsons called Daryl Isbell to testify that the words "to the canal" mean to the center of the canal and that the words "bounded by" mean in the area of the canal, the trial court noted that Mr. Isbell "could not say the line was in the center of the canal." In addition to citing Mr. Isbell's testimony, Appellants also cite Black's Law Dictionary and Brown's Control and Legal Principles for the proposition that the words "bounded by" mean that the boundary line must be located only near Jacks Creek, as opposed to along its centerline.

While the Appellants argue that the standard interpretation of the words "bounded by" would locate the boundary somewhere near Jacks Creek, they fail to take into account the evidence on which the trial court determined the location of the boundary line. The trial court specifically determined the boundary "[i]n light of the actual deed description, the

[s]urveyor's interpretation, and the testimony of Mr. Brooks." Instead of interpreting the deed solely as a matter of law, the trial judge relied on deed descriptions, Mr. Perry's interpretation of those deeds, the Perry survey, and Mr. Brooks's testimony. As discussed above, the determination of where a boundary is located on the face of the earth, especially when there is conflicting evidence regarding a boundary's location, is a question of fact. *Hong*, 2012 WL 388448 at \*5. The testimonies of Messrs. Brooks and Perry support the trial court's conclusion that the common boundary line is located along the centerline of Jacks Creek. From the totality of the circumstances, and in light of the specific credibility findings made by the trial court, we cannot conclude that the trial court's determination of the location of the boundary line was erroneous.

### Damages for Timber

In its December 31, 2013 ruling, the trial court made the following, relevant findings concerning the amount of damages:

> 7. The Court finds that Mr. Johnson instructed Mr. Hill to cut the trees and bushes on the land at the top of the bank on the east/south side of the Jacks Creek canal between Mr. Johnson and Mr. McEarl.
>
> *                                  *                                  *
>
> 9.     The Court finds that as per the testimony of Mr. Wade McMahan, a private forestry consultant, the Defendant called Mr. Hill to cut trees on Plaintiffs' property with an average value of $6,881.32, considering the high and average values as set forth in his exhibit. The Court further finds that Mr. Johnson was negligent in cutting trees and in fact did continue to cut the trees after being instructed to stop cutting and after Mr. McEarl had rejected his request to take some of the money and let him continue cutting. Therefore, the Defendant was negligent in cutting the trees, but was not acting with a bad motive, malice, fraud, or oppression, but perhaps an honest belief he was doing what he was entitled to do. The Court finds it appropriate to assess Mr. Johnson with damages in twice the amount of the average value, or $13,762.64.

Having determined that the trial court did not err in setting the common boundary line along the centerline of Jacks Creek, and in light of the undisputed fact that Mr. Johnson had timber

cut beyond that line, i.e., removed timber from the McEarls' property, the McEarls are entitled to damages for the loss of that timber. Importantly, Appellants do not contest the $6,881.32 value of the timber as established by Mr. McMahan's testimony and accompanying exhibits. Instead, Appellants argue that the award of double the timber's value was erroneous as it was allegedly punitive in nature.

Tennessee Code Annotated Section 43-28-312 provides, in relevant part, that:

> (a)(1) Civil liability for the negligent cutting of timber from the property of another is in an amount double that of the current market value of the timber.
>
> (2) If the timber is negligently cut from the property of another because the landowner for whom the timber is being cut has marked or designated the boundary of the landowner's property incorrectly, then the landowner is jointly liable for the double damages.
>
> (b) Civil liability for knowingly and intentionally cutting timber from the property of another is in an amount treble that of the current market value of the timber.

From our review of the record and the ruling of the trial court, it does not appear that the court made any finding that Mr. Johnson's removal of the disputed timber was malicious, or done with gross negligence. Such findings would allow for treble damages under subsection (b) of the foregoing statute. Instead, it appears that the trial court's award of double damages was based upon its conclusion that in the absence of a clearly defined boundary line, Mr. Johnson's action in having the timber cut was negligent. The evidence does not preponderate against this conclusion.

For the foregoing reasons, we affirm the order of the trial court. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellants, Talmo and Mary Sue Johnson, the Talmo Johnson Trust, and their surety.

_____
KENNY W. ARMSTRONG, JUDGE