IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 25, 2015 Session

# WILLIAM WAYNE CUTSHAW ET AL. V. KENTON D. HENSLEY ET AL.

**Appeal from the Chancery Court for Greene County**
**No. 20110260    Douglas T. Jenkins, Chancellor**

———————————

**No. E2014-01561-COA-R3-CV-FILED-JULY 29, 2015**

———————————

In 2009, William Wayne Cutshaw and Tincy Faye Cutshaw sold a piece of commercial real property (the property) to Kenton D. Hensley and Pamela F. Hensley. The property was improved with a retail business whose trade name was Glendale Market & Deli. The total purchase price of the property, including its contents, was $215,000. The Hensleys executed two notes, one of which was for $175,000. It was secured by a deed of trust on the property. After the Hensleys defaulted in 2011, the Cutshaws bid in the property at a foreclosure sale for $20,000. The Cutshaws then brought this action seeking a deficiency judgment for the balance owed by the Hensleys. The trial court, applying the governing statute, Tenn. Code Ann. § 35-5-118 (Supp. 2014), found that the property had sold at the foreclosure sale for an amount materially less than its fair market value, which latter amount the court found to be $215,000 as of the time of the foreclosure sale. The trial court relied upon the formula prescribed by Tenn. Code Ann. § 35-5-118(c), which code section provides that "the deficiency shall be [(1)] the total amount of the indebtedness prior to the sale plus the costs of the foreclosure and sale, less [(2)] the fair market value of the property at the time of the sale." The trial court found concept number one to be $173,620.30 and the second concept to be $215,000. Since the difference is a negative figure, the trial court declined to award the Cutshaws a deficiency judgment in any amount. The Cutshaws appeal. We hold that the evidence preponderates in favor of the conclusion that the fair market value of the property at the time of the foreclosure sale was $89,000. We agree with the trial court's determination that the foreclosure sale price – $20,000 – was materially less than fair market value. We hold, however, that the Cutshaws are entitled to a deficiency judgment. Accordingly, we reverse the trial court's judgment and award the Cutshaws a deficiency judgment in the amount of $84,620.30. In accordance with the terms of the promissory note, we remand to the trial court for a determination of a reasonable attorney's fee to be awarded to the Cutshaws for trial work and professional services on appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed;**
**Judgment Awarded to Appellants; Case Remanded for Further Proceedings**

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Jerry W. Laughlin, Greeneville, Tennessee, for the appellants, William Wayne Cutshaw and Tincy Faye Cutshaw.

David L. Robbins, Johnson City, Tennessee, for the appellees, Kenton D. Hensley and Pamela F. Hensley.

**OPINION**

I.

The property at issue is approxmiately half an acre, improved with a building used as a gas station, convenience store, and deli-type restaurant.  The Cutshaws bought the property in 1996 for $34,125.  They made significant improvements, including installing new gas pumps and rewiring the building's electrical system.  The Cutshaws operated their business as Glendale Market & Deli until they sold it to the Hensleys in 2009.  Buyer Pamela Hensley is the niece of seller Tincy Faye Cutshaw.  William Wayne Cutshaw testified that Kenton Hensley approached him about buying the property.  Mr. Hensley conversely testified that Mr. Cutshaw "come to me and and said that he was ready to retire and he was wanting to sell the store."

The parties agreed on a sales price of $215,000.  It is undisputed that the sales price included the sale of equipment and inventory used in the operation of the business, as well as the right to continue using the Glendale name.  The parties closed the deal on August 17, 2009.  The Hensleys paid $29,000 down and executed two promissory notes, one in the amount of $11,000 and the other for $175,000.  The $11,000 note was paid in the fall of 2009.  The $175,000 note was secured by a deed of trust on the property.

The Hensleys struggled to operate the business profitably.  They listed the property for sale in November of 2010 but were unable to sell it.  The Hensleys made their last payment to the Cutshaws in January of 2011.  The Cutshaws sent them a notice of default in June of 2011.  The property was sold at a foreclosure sale on August 17, 2011.  The Cutshaws were the high bidders and received the property back for $20,000.

On September 8, 2011, the Cutshaws filed this action seeking to collect the balance owed on the $175,000 note.  Meanwhile, on October 5, 2011, the Cutshaws sold the property to Phillip Fletcher and Sharon Fletcher for $89,000, all of which was paid in cash.

2

A bench trial was held on July 1, 2014. Three witnesses testified – Mr. Cutshaw, Mr. Hensley, and Gail Landers, a real estate broker who listed the property for the Hensleys in 2010. The trial court entered its final judgment on July 17, 2014, finding and holding in pertinent part as follows:

> Although the [Hensleys] requested that the Court determine that the terms of the contract were unconscionable and wanted this Court to rescind the contract, the Court is disinclined to do so, since there appears, from the evidence presented, testimony as a whole, and the findings in this case, to be a valid contract.

> \* \* \*

> The Court finds that the parties agreed to the value of the commercial establishment, and agreed that fair market value was $215,000.00. The Court finds this number to be representative of fair market value for this property, since the buyer was willing to pay the seller that amount.

> The Court also finds that after the Hensleys removed equipment and inventory from the building, that it retained a value very near $215,000.00 and when sold again in 2011, the fair market value was at or near $215,000.00.

> If the Court reviews T.C.A. §35-5-118 regarding Deficiency Judgments, the Court notes that in paragraph (c), if the debtor can prove by a preponderance of the evidence that the foreclosure sale yielded an amount "materially less than the fair market value of the property," the deficiency shall be the total amount of the indebtedness prior to the sale plus the costs of the foreclosure and sale, less the fair market value of the property at the time of the sale as determined by the Court.

> The Court finds, through Mr. Cutshaw's testimony, that the property sold at the foreclosure sale was "materially less than the fair market value," as he stated he bought it at the foreclosure sale for $20,000.00.

3

Therefore, the Court acknowledges that the deficiency was $171,620.30 and the costs of the foreclosure sale were $2,000.00 totaling to $173,620.30; while the fair market value of the property is $215,000.00.

Using the formula pursuant to T.C.A. §35-5-118(c), the Court will deduct the fair market value of $215,000 from the deficiency judgment of $173,620.30 which leaves a negative balance equating to a balance of zero ($0.00) dollars.

Therefore, the Judgment awarded to the [Cutshaws] is in the amount of zero ($0.00) dollars.

(Numbering in original omitted.) The trial court also declined to award attorney's fees to either party. The Cutshaws timely filed a notice of appeal.

## II.

The issues before us are whether the trial court erred in (1) finding the fair market value of the property to be $215,000 at the time of the foreclosure sale, and (2) declining to award the Cutshaws a reasonable attorney's fee as provided by the terms of the promissory note.

## III.

In this non-jury case, our standard of review is de novo upon the record of the proceedings below; however, the record comes to us with a presumption of correctness as to the trial court's factual determinations, a presumption we must honor unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); **Wright v. City of Knoxville**, 898 S.W.2d 177, 181 (Tenn. 1995). There is no presumption of correctness as to the trial court's legal conclusions. **Kendrick v. Shoemake**, 90 S.W.3d 566, 569 (Tenn. 2002); **Campbell v. Florida Steel Corp**., 919 S.W.2d 26, 35 (Tenn. 1996).

## IV.

This deficiency judgment action is governed by Tenn. Code Ann. § 35-5-118, which provides in pertinent part as follows:

(a) In an action brought by a creditor to recover a balance still owing on an indebtedness after a trustee's or foreclosure sale of real property secured by a deed of trust or mortgage, the

creditor shall be entitled to a deficiency judgment in an amount sufficient to satisfy fully the indebtedness.

(b) In all such actions, absent a showing of fraud, collusion, misconduct, or irregularity in the sale process, the deficiency judgment shall be for the total amount of indebtedness prior to the sale plus the costs of the foreclosure and sale, less the fair market value of the property at the time of the sale. The creditor shall be entitled to a rebuttable prima facie presumption that the sale price of the property is equal to the fair market value of the property at the time of the sale.

(c) To overcome the presumption set forth in subsection (b), the debtor must prove by a preponderance of the evidence that the property sold for an amount materially less than the fair market value of property at the time of the foreclosure sale. If the debtor overcomes the presumption, the deficiency shall be the total amount of the indebtedness prior to the sale plus the costs of the foreclosure and sale, less the fair market value of the property at the time of the sale as determined by the court.

The Cutshaws argue that the Hensleys should be precluded from arguing that the foreclosure sale price was materially less than fair market value, because the Hensleys did not expressly make such an allegation in their answer or other pleading. We disagree. Clearly, both sides knew and argued that Tenn. Code Ann. § 35-5-118 was the controlling authority. Both the Cutshaws and the Hensleys presented proof and argument to the trial court regarding the fair market value of the property at the time of the foreclosure sale. The record reflects that both parties, and the trial court, understood that fair market value was at issue under the statute, and thus the issue was fairly tried by implied consent. *See* Tenn. R. Civ. P. 15.02; *McLemore v. Powell*, 968 S.W.2d 799, 803 (Tenn. Ct. App. 1997).

The initial, and fundamental, issue in this deficiency judgment action is whether the trial court erred in finding the fair market value of the property at the time of the foreclosure sale to be $215,000. *See Capital Bank v. Brock*, No. E2013-01140-COA-R3-CV, 2014 WL 2993844 at *6 (Tenn. Ct. App. E.S., filed June 30, 2014) ("[T]he issue in deficiency actions is the fair market value of the property *at the time it was sold*"), quoting *Lost Mtn. Dev. Co. v. King*, No. M2004-02663-COA-R3-CV, 2006 WL 3740791 at *8 (Tenn. Ct. App. M.S., filed Dec. 19, 2006) (emphasis in *Capital Bank*). The trial court's valuation of property is a determination of fact, to which a presumption of

correctness attaches in our review, unless the evidence preponderates otherwise. We review the evidence presented at trial pertaining to the property's fair market value.

Mr. Cutshaw testified as follows regarding his negotiations with Mr. Hensley over the price for the 2009 sale from the Cutshaws to the Hensleys:

> Q. Do you recall whether or not there was an appraisal done when the store was sold to Mr. and Ms. Hensley?
>
> A. I don't have the least idea.
>
> \* \* \*
>
> Q. Okay. Do you recall that there was an appraisal done when you sold the store in the end of 2011 to Ms. Fletcher?
>
> A. I don't think so.
>
> Q. Okay. May I ask, Sir, what was the basis of your sales price to the Hensleys of $215,000.00?
>
> A. That's what it was worth.
>
> Q. Okay. Where did you come up with that?
>
> A. I just told them what I would take for it and that was it.
>
> Q. I understand but what made you know that you were getting a good deal or getting a bad deal if you sold it for that price?
>
> A. He got a good deal.
>
> Q. What information are you using to make that statement?
>
> A: Well, I just (INAUDIBLE) I just took him in there because he wanted to buy it.

Mr. Hensley testified as follows:

Q. Do you understand that you purchased a commercial establishment for $215,000.00?

A. Yes.

Q. Who came up with that price?

A. Mr. Cutshaw.

Q. Did you get an appraisal done of the property to make sure that was a good price?

A. No, we didn't.

Q. What made you think that $215,000.00 was a good price to pay?

A. I didn't.

Q. Why did you agree to pay it?

A. Just talked to Mr. Cutshaw and made an agreement. I thought we were all right.

On November 22, 2010, approximately 15 months after they bought the property, the Hensleys listed it for sale with real estate broker Landers. She testified in pertinent part as follows:

Q. Do you recall what your first price was that you sold it, or listed it for?

A. We listed it at first for $295,900.00.

Q. And do you recall where that number came from?

A. That was from, with talking with them. That was what they felt like they had in it. They felt like that was the price they wanted to try to get for it.

7

Q. Okay. And were you able to look up any comps (phonetically) at that time in 2010 to see if that number represented a fair market value?

A. I didn't. And I do not recall everything from that time period. . . . I do remember having a hard time trying to face [sic] that price and I do remember I had sold one other property, I know our commercial and residential was down because that was after the crash. So we were starting to climb our way out. It was a little difficult for me.

Q. Okay. Do you recall how long it was listed for $295,900.00?

A. Well, I do not have that. I do know that within a period of 11/22/2010 we had listed it over periods of time, different prices, had dropped it but the final price that I had before I withdrew it was $169,900.00. That was in at least 2011.

*     *     *

Q. [I]f anybody had made a firm offer and wasn't just feeling it out but were being serious about making an offer, would you have some written documentation of that?

A. Yes.

Q. And you don't have anything regarding that?

A. Huh-uh (negative).

Ms. Landers also testified that the assessment of the property's value for property tax purposes in 2012 was $71,900.

Neither the Cutshaws nor the Hensleys presented evidence of an appraisal of the property by a real estate appraiser or anyone else, apparently because none was done at any time pertinent to this action. The parties agreed that part of the $215,000 sales price reflected the sale of equipment and inventory used to operate the business, and the right to use the name "Glendale Market & Deli." Mr. Cutshaw testified that $29,000 of the sales price was for these items. Mr. Hensley testified:

8

Q. How much did you pay for the inventory and equipment?

A. $40,000.00.

Q. And you paid how much of that up front?

A. $29,000.00.

Q. Did you pay the remaining $11,000.00 by the end of August 2009?

A. Yes, we did.

The Cutshaws did not dispute Mr. Hensley's assertion that the Hensleys paid $11,000 by the end of August of 2009. As already noted, the promissory note secured by the deed of trust was in the amount of $175,000, which is $40,000 less than the sales price. We find that the evidence preponderates in favor of the conclusion that the parties intended the price for the realty to be $175,000, and the price for the equipment and inventory to be $40,000.

It was undisputed that the Hensleys sold the equipment and inventory before the notice of default and foreclosure sale. At the time of the foreclosure sale, the commercial building on the property was described as an "empty shell."[1] Consequently, we hold that the evidence preponderates against the trial court's conclusion that the fair market value of the real estate at the time of the foreclosure sale was $215,000.

As already stated, at the foreclosure sale the Cutshaws bid in the winning amount of $20,000 and took back the property. They sold the property 49 days later, on October 5, 2011, to the Fletchers for $89,000 cash. Mr. Cutshaw testified about that transaction as follows:

Q. Now, Mr. Cutshaw, after you purchased this property at that foreclosure sale, did you go back out there and open up the property?

A. Yes.

Q. And were you in there working on the property?

---

[1] Apparently the gas pumps and the underground fuel storage tanks remained, however, for there was no proof to the contrary.

A. Yes, Sir.

Q. When Mr. and Ms. Fletcher came in and asked you about the possible purchase of this property?

A. Yes, Sir.

Q. Now when you got the property back from the foreclosure sale was there any equipment in there?

A. No, Sir.

Q. Was there any inventory in there?

A. No, Sir.

*     *     *

Q. Do you remember how much you had it listed for?

A. I didn't have it listed. This lady just come in and bought it.

Q. Okay. She came in and negotiated with you directly?

A. Right there in the store. No, I didn't have no market or nothing.

Q. Okay. How come you sold it to her for $89,000.00?

A. Like I said I was retired and, so she come along and wanted to start a store so I put her in it.

*     *     *

Q. Did you have any idea what the tax appraisal was of it?

A. No, it goes up and down so much, I don't know.

Q. Yes, Sir. Okay. So did she pay you the $89,000.00 outright or did she have to make payments?

10

A: Cash.

*     *     *

Q. . . . Did you have to put money into [the property] when you got it back as a shell or you maybe called it a hole earlier, *did you have to put money into it so you could sell it to Ms. Fletcher*?

A. *No, Ma'am*.

Q. *You did not? You sold it to her like that*?

A. *Just like it was*.

(Emphasis added.)

Tenn. Code Ann. § 35-5-118 does not contain a definition of "fair market value." Furthermore, few Tennessee appellate decisions have defined the term. In ***Harper-Wittbrodt Automotive Group, LLC v. Teague***, No. M2001-02812-COA-R3-CV, 2002 WL 31467888 at *6 (Tenn. Ct. App. W.S., filed Nov. 6, 2002), we observed that "[f]air market value is defined as 'the fair or reasonable cash price for which the property can be sold on the market.' " (citing *Black's Law Dictionary* 537 (5th ed. 1979)). The most recent edition of Black's Law Dictionary defines it as "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect." *Id.* (10th ed. 2014). The Supreme Court has provided the following guidance:

> An examination of texts and judicial utterances reveals the fact that the expression "fair market value" has no invariable definition, but that its meaning varies with the circumstances surrounding a given object and situation to which it is sought to apply the term.
>
> When the Supreme Court of the State of Washington was dealing with the definition of "market price" in the case of ***McGarry v. Superior Portland Cement Co.***, 95 Wash. 412, 163 P. 928, Ann.Cas.1918A, 572, its observation, stated in the language of the text of 55 C.J.S., p. 786, was this:— "When the term becomes the subject of legal controversy, it

11

will be given that meaning which will best serve the purpose and intent of those who use it." The good sense of that statement is readily recognized, and it is as equally applicable to the term "fair market value" when that term becomes the subject of legal controversy.

*John W. McDougall Co. v. Atkins*, 301 S.W.2d 335, 337 (Tenn. 1957).

We are of the opinion that the proof presented here, as summarized above, preponderates in favor of the conclusion that the fair market value of the real property at the time of the foreclosure sale was $89,000. In this case, the property was sold at that price a mere 1½ months after the foreclosure sale. There is no evidence in the record that the sale from Cutshaws to Fletchers was anything other than a transaction freely negotiated at arm's length. Significantly, Mr. Cutshaw testified that he sold the property "just like it was" without putting any money into it to improve it after the foreclosure sale. We are aware of this Court's recent observation that a subsequent sale price of a property after a foreclosure sale is generally of limited relevance to establish fair market value at the time of the foreclosure sale, particularly those that are sold a long time after the foreclosure sale. *See Halliman v. Heritage Bank*, No. M2014-00244-COA-R3-CV, 2015 WL 1955448 at *5-6 (Tenn. Ct. App. M.S., filed Apr. 30, 2015). In this case, however, the $89,000 price is relevant and helpful to establish a fair market value because of: (1) the absence of other potentially relevant proof, such as an appraisal of the property around the time of the foreclosure sale; (2) the short period of time, 49 days, that elapsed between foreclosure sale and the resale to the Fletchers; and (3) Mr. Cutshaw's admission to the effect that no significant changes to the property occurred between the two sales. *Halliman* is thus distinguishable on these grounds.

We now turn to the question of whether the foreclosure sale price of $20,000 is "materially less" than the fair market value of $89,000 under the applicable statute. We have little difficulty in finding that it is. Tenn. Code Ann. § 35-5-118 was enacted in 2010, with an effective date of September 1, 2010. In each of our few previous decisions that have addressed this issue, this Court has held that the debtor failed to overcome the statutory presumption that the foreclosure sale price is equal to the fair market value at the time of the foreclosure sale. *See Halliman*, 2015 WL 1955448 at *6 ("Although [the debtor's] personal valuation of the property is approximately 22% more than the aggregate of the foreclosure sales, we find his opinion, without other competent and relevant evidence to support it, fails to rebut the statutory presumption"); *Capital Bank*, 2014 WL 2993844 at *5-6 (difference between debtor's estimate of $475,000 value and foreclosure sale price of $400,000 – 16% less – not "materially less"); *GreenBank v. Sterling Ventures, LLC*, No. M2012-01312-COA-R3-CV, 2012 WL 6115015 at *7, *10 (difference between debtor's estimate of $750,000 and foreclosure sale price of $667,400

– 11% less – not "materially less"); *see also **In re Radewald***, No. 14-33542, 2015 WL 1541414 at *6 (Bankr. E.D. Tenn., filed Mar. 30, 2015) ("a 9% difference between the fair market value as established by the appraisal and the foreclosure bid of the Bank" not "materially less" under Tenn. Code Ann. § 35-5-118). In ***FirstBank v. Horizon Capital Partners, LLC,*** No. E2013-00686-COA-R3-CV, 2014 WL 407908 at *3 (Tenn. Ct. App. E.S., filed Feb. 3, 2014), we explained:

> the parties necessarily agreed that the foreclosure price was 20 percent below the appraisal price. This court has refrained from establishing a "bright-line percentage, above or below which the statutory presumption is rebutted." ***GreenBank v. Sterling Ventures, LLC***, No. M2012–01312–COA–R3–CV, 2012 WL 6115015, at *10–11 (Tenn. Ct. App. Dec. 7, 2012). Instead, this court has opted to consider the percentage difference along with the condition of the property and any other factors that may provide information concerning the marketability of the property and the surrounding area. ***Id.***; *see also **State of Franklin Bank v. Riggs***, No. E2010–01505–COA–R3–CV, 2011 WL 5090888, at *6 (Tenn. Ct. App. Oct. 27, 2011) (considering the demand for development and the economic climate in the surrounding area). The only additional evidence offered on the condition of the property in this case was provided by Defendants, who simply asserted that the property was complete and habitable as evidenced by lessee's occupation of the premises. While we are constrained to take the evidence in the view most favorable to the nonmoving party, Defendants are essentially asking this court to presume that the appraisal price was equal to the fair market value. Such is not the standard. With these considerations in mind, we conclude that Defendants failed to present sufficient evidence to rebut the presumption that the foreclosure price was equal to the fair market value of the property at the time of the sale.

In the present case, the $20,000 foreclosure sale price is approximately 78% less than the property's fair market value of $89,000. We hold that the Hensleys have met their burden of proving by a preponderance of the evidence that the property sold for an amount materially less than the fair market value of property at the time of the foreclosure sale, and have thereby overcome the statutory presumption. It is undisputed that the amount of the Hensleys' indebtedness under the promissory note was $171,620.30 and the costs of the foreclosure sale were $2,000, yielding a total of

$173,620.30. Subtracting the fair market value of $89,000 under the statutory formula results in a deficiency judgment for the Cutshaws in the amount of $84,620.30.

The Cutshaws argue that the trial court should have awarded them an attorney's fee in accordance with the terms of the promissory note, which provides:

> The undersigned shall . . . pay a reasonable attorneys' fee in the event this promissory note is not paid as herein provided, and is placed in the hands of an attorney for collection, the amount of which shall be added to and become part of this promissory note and any Judgment.

As we observed in *FirstBank*,

> Tennessee follows the American Rule which provides that "litigants pay their own attorney's fees absent a statute or an agreement providing otherwise." *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 194 (Tenn. 2000); *accord Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn. 2005). "Under the American [R]ule, a party in a civil action may recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American [R]ule applies, allowing for recovery of such fees in a particular case." *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009) (citing *Taylor*, 158 S.W.3d at 359; *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998)). Having reviewed the pertinent documents, we conclude that an award of attorney fees on appeal was contemplated in the loan documents.

2014 WL 407908 at *4. Similarly, we hold in this case that the parties clearly contemplated and agreed that the Hensleys would pay a reasonable attorney's fee in the event that they defaulted on the note. On remand, the trial court will hear proof and determine the amount of a reasonable attorney's fee, including a fee for work done on appeal, and include such award in its judgment to the Cutshaws.

## V.

The judgment of the trial court is reversed, and the appellants are awarded a judgment against the appellees for $84,620.30. This case is remanded to the trial court for further proceedings consistent with this opinion. Costs on appeal are assessed to the appellees, Kenton D. Hensley and Pamela F. Hensley.


_____
CHARLES D. SUSANO, JR., CHIEF JUDGE